

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-76,052

### JAMES GARRETT FREEMAN, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. 15987
### IN THE 329TH JUDICIAL DISTRICT COURT
### WHARTON COUNTY

**MEYERS, J., delivered the opinion of the unanimous Court.**

### O P I N I O N

In November 2008, a jury convicted appellant of the capital murder of Texas

Game Warden Justin Hurst committed in March 2007. TEX. PENAL CODE ANN. §

19.03(a)(1). Based on the jury's answers to the special issues set forth in Texas Code of

Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial court sentenced

appellant to death. Art. 37.071, § 2(g).[1] Direct appeal to this Court is automatic. Art.

---

[1] Unless otherwise indicated all references to Articles refer to the Code of Criminal
Procedure.

37.071, § 2(h).  After reviewing appellant's twelve points of error, we find them to be without merit.  Consequently, we affirm the trial court's judgment and sentence of death.

FACTS

On Friday, March 16, 2007, Texas Game Warden Jonathan Blackburn was conducting surveillance in an area where residents had complained of shots being fired at night.  He parked his truck on the side of the road with its lights off, and around 11:00 p.m., he saw a truck driving very slowly in his direction.  He heard a single gunshot, which he thought came from a .22 caliber or smaller rifle.  Blackburn intended to investigate the shot because it is illegal to fire shots or hunt from the side of the road.[2]  Blackburn drove toward the truck and activated his "red and blue lights" and in-car video camera system when he was within thirty to forty yards of it.  The truck continued driving toward Blackburn, and rather than stopping when Blackburn activated his lights, the truck "sped off" once it passed him.  Blackburn did not recognize the driver at that time and described him as a white or Hispanic male with a goatee and wearing a stocking cap.

Blackburn followed the fleeing truck down several gravel and paved roads at speeds ranging from 45 to 100 miles per hour (mph).  He requested backup from the Wharton County Sheriff's Office.  Constable John Szymanski and Deputy Constable Jeremy Hyde joined the pursuit in their marked patrol car with lights activated and took over the lead from Blackburn because their car was faster than Blackburn's truck.  The

---

[2] It was later discovered that the shot had killed a possum.

constables' patrol car followed the fleeing truck at speeds up to 130 mph on the paved roads. They were joined by Deputies Mark Tijerina, Roddy Rodriguez, and Chris French, all in marked patrol cars with lights activated. It was obvious to Blackburn that the driver knew the area and was familiar with the roads, and eventually Blackburn realized that the driver of the fleeing truck was traveling in a circular route back to near where the pursuit began.

Not yet a part of the pursuit, Texas Game Warden Hurst communicated that he was going to attempt to set up a roadblock at an intersection. The fleeing driver was able to steer his truck around the roadblock without going into the ditch but sideswiped Hurst's truck in the process. Hurst joined the pursuit, which continued for approximately another 30 minutes on predominately gravel roads. According to Blackburn, there was no viable spot to force the driver to stop. The law enforcement officers were forced to follow and wait. Texas Department of Public Safety (DPS) troopers and the constables attempted to deploy spike strips several times, but the driver of the fleeing truck managed to avoid the spikes each time.

By this time, the dispatcher had completed a check on the fleeing truck's license plates. The license plates identified the truck as being registered to appellant. Blackburn and Szymanski were familiar with appellant. Blackburn had written him a ticket the previous year without incident but had not recognized him as the driver of the truck when the pursuit began. Officers believed the truck was stolen because the behavior of the

driver was not consistent with what they knew about appellant. Appellant, however, was later identified as the driver.

Eventually, appellant drove over a set of spikes deployed by a DPS trooper. Appellant steered his disabled truck into a driveway in front of the Lissie Cemetery. He parked the truck with the driver's side door away from the pursuit vehicles, putting the truck between himself and the law enforcement officers. Blackburn and Rodriguez believed, as they parked their own vehicles, that appellant would attempt to flee. However, as appellant exited his truck, he began firing a handgun at officers. According to Blackburn, appellant's manner was aggressive, and he took a protected position from which he could see the three officers in front. Appellant continued to shoot the handgun until it seemed to be out of ammunition, and the officers returned fire. Appellant "disappeared" for a "second" and "[came] back out with a long gun" that Blackburn identified as a semi-automatic rifle by the number of shots fired. Tijerina, who was trapped in his patrol car, immediately recognized the rifle as an AK-47 assault rifle and realized that his car would offer little protection from the rifle's bullets. Officers retreated to the backs of their vehicles for better cover. Appellant never exposed himself to open fire or moved out from behind the bed of his truck as he shot at officers. It "seemed to [Tijerina] like he was trying to kill somebody."

Blackburn watched as Hurst left his cover and moved into the open where he had a clear shot at appellant. Hurst fired at appellant from a low, crouched position while other

officers were not able to return appellant's fire. Appellant saw Hurst, aimed the rifle at him, and shot. Blackburn did not actually see Hurst fall when appellant shot at him but saw him lying face down on the ground afterward. Blackburn initially thought that Hurst was taking a more protected position flat on the ground but soon realized that he had been shot. Hurst died from a penetrating gunshot wound in his left arm and torso.

## CHANGE OF VENUE

In his first point of error, appellant alleges that the trial court erred in denying his requested change of venue because he could not obtain a fair and impartial trial in Wharton County. Appellant states that "[t]he single most important issue in this entire case was the trial court's refusal to recognize reality and move this high profile case out of Wharton County." He alleges that "despite extraordinary evidence of the difficulty of obtaining a fair trial," the trial court erroneously denied appellant's Motion for Change of Venue.

Appellant complains that the pretrial publicity began to taint the Wharton County jury pool almost immediately after the offense. According to appellant, because Wharton County has a small population of around 40,000 residents, local publicity and gossip concerning the offense was extensive. Appellant points out that the community quickly hosted fund-raisers and created a memorial fund to help the victim's widow. Appellant theorizes that the organizers' true intentions were to keep the victim's death fresh in the

minds of the public, thus prejudicing the jury pool. He also alleges that false rumors from "known and trusted sources" quickly spread throughout the community.

Appellant also complains that the State's response to the Motion for Change of Venue exacerbated the prejudice against him. After appellant filed his motion and supporting affidavits, the State began collecting controverting affidavits. Appellant claims that in doing so, the State further publicized the murder. Appellant takes issue with the number of controverting affidavits collected and the manner in which some were collected. The State collected 372 controverting affidavits, which appellant characterizes as "an overt attempt to influence the judicial process" by keeping appellant's trial in Wharton County that demonstrates a "hundreds-large combination aligned against [appellant] and one that was so aligned by influential government officials." Appellant argues that this large number of controverting affidavits is evidence of a prejudice in the county because there was a concerted public effort to influence the process and keep the trial in Wharton County.

Appellant additionally complains that thirteen of the fifty-one notaries who validated the affidavits also signed controverting affidavits themselves. Further, he complains that one of the notaries was an elected constable who was involved in the chase preceding the offense and ultimately testified during trial. This notary collected twenty affidavits while in uniform, which appellant argues "means that elected and other County officials were actively involved in collecting these affidavits and were asking

people to try to keep the trial in Wharton County." Appellant further argues that a uniformed official among those collecting affidavits made it more likely that people would have drawn negative inferences about appellant or might have been intimidated into signing an affidavit.

Appellant further complains that the sheer size of the venire pool evidenced the community prejudice against him. The trial court ultimately requested two special venires of 600 people each, for a total of 1,200 potential jurors. Appellant characterizes the size of the first special venire as evidence that the trial court was "suspicious" of whether appellant could receive a fair trial. Appellant claims that the need for a second special venire was further proof that he could not receive a fair trial in Wharton County.

The initial qualification of the venire was held on September 9, 2007, and fewer than 200 of the 600 called appeared in person. Twenty-nine potential jurors were excused before the venire was seated. The trial court conducted group voir dire with 162 qualified jurors. Only 28 of the 162 had not read about the case in the newspaper. At the conclusion of the trial court's voire dire, 121 potential jurors remained to complete questionnaires. Of those, 62 potential jurors were questioned in individual voir dire. Eleven jurors were seated from this panel, and the trial court requested an additional 600-person special venire from which to seat the twelfth juror and two alternate jurors. The trial court conducted group voir dire of the second special venire with 161 qualified jurors. Only fifteen had not heard about the case. Following the trial court's group voir

dire, 84 potential jurors remained to fill out questionnaires. The remaining juror and two alternate jurors were chosen from this panel following the individual voir dire of eight potential jurors. Appellant argues that the large number of potential jurors who had some knowledge of the case, as well as the need to call 1,200 potential jurors, was indicative of the fact that he could not receive a fair trial in Wharton County.

Article 31.03(a) of the Texas Code of Criminal Procedure provides that a change of venue may be granted if the defendant establishes that:

1.  [T]here exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial; and

2.  [T]here is a dangerous combination against him instigated by influential persons, by reason of which he cannot expect a fair trial.

Appellant's primary argument, as understood by the Court, concerns the pervasiveness and the inflammatory nature of local pretrial publicity. He claims that the pretrial publicity poisoned the jury pool, which denied him the opportunity of a fair trial, and thus, it was erroneous for the trial court to deny his motion.

We review a trial court's ruling on a motion for change of venue for abuse of discretion. *Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007). If the trial court's decision falls within the zone of reasonable disagreement, it will be upheld. *Id*.; *see also Narvaiz v. State*, 840 S.W.2d 415, 428 (Tex. Crim. App. 1996). The two primary means for discerning whether publicity is pervasive are a hearing on the motion to change

venue and the voir dire process. *Gonzalez*, 222 S.W.3d at 449. In this case, the trial court used both.

At the hearing on the motion to change venue, appellant introduced into evidence four articles about the offense published by local newspapers: Siegler Shares Thoughts on Emotions of Trials, *Public Seating To Be Limited During Freeman Murder Trial*, *Siegler Now Able to Focus on Trial Without Playing Politics*, and *Former Harris County ADA Joins Prosecution Team For Freeman Trial*. He also introduced lists of law enforcement officers who attended Hurst's funeral, a transcript of the radio broadcast of the funeral, a list of contributions made to memorial funds honoring Hurst, and copies of thirty-two controverting affidavits that were faxed to the District Attorney's office from the El Campo Police Department and seven that were faxed to the District Attorney's office from El Campo High School. Appellant did not present evidence of how many people heard the radio broadcast. Similarly, he did not present evidence as to how many people read the newspaper coverage of the case. During the hearing, appellant agreed that the shooting of a game warden would likely create statewide, and not just local, publicity. The trial court pointed out that whether a potential juror had contributed to a memorial fund was a matter that could be investigated during voir dire.

In regard to the voir dire process, appellant argues that the number of jurors who were unable to serve on the jury in this case shows the extent to which local pretrial publicity permeated the community. Out of 323 members of the two special venires, 280

were familiar with the case. Appellant reasons that the high percentage of special venire members who had heard about the case is reason enough to consider the entire community "poisoned" by the pretrial publicity.

Appellant's conclusion, however, does not comport with this Court's precedent. In the past, this Court has found that trial courts acted within their discretion in not granting a motion for a change of venue even where a large portion of the venire had seen publicity about the case. *See, e.g.*, *id*. at 450 (121 of 180 venire members were familiar with the case); *Von Byrd v. State*, 569 S.W.2d 883, 890-91 (Tex. Crim. App. 1978) (69 of 109 venire members were familiar with the case). We have also found no abuse of discretion even when many of the venire members stated that they had formed an opinion that they could not set aside. *See, e.g.*, *Gonzalez*, 222 S.W.3d at 450 (58 of the 180 venire members indicated that they could not set aside their opinions); *see also Gardner v. State*, 733 S.W.2d 195, 204-05 (Tex. Crim. App. 1987).

The trial court heard responses from prospective jurors regarding their knowledge of the case and their ability to be fair and impartial. The trial court was within its discretion to believe prospective jurors' statements that they were not unduly influenced and could deliver a fair verdict. That there were a large number of venire members who had heard of the case, or who could not set aside their opinions about the case, does not establish that pretrial publicity permeated the community to such an extent that it was

impossible to seat a fair and impartial jury. The trial court's decision to deny the Motion for Change of Venue was not outside the zone of reasonable disagreement.

Regarding appellant's brief claim of a "dangerous combination against him," he has presented nothing other than speculation to convince this Court that the trial court abused its discretion in denying his Motion for Change of Venue on this basis. Appellant's complaint that a "hundreds-large combination aligned against [appellant] and one that was so aligned by influential government officials" is not persuasive and is not supported by the record. Point of error one is overruled.

## FUTURE DANGEROUSNESS

In his second point of error, appellant challenges the legal sufficiency of the evidence supporting the jury's determination regarding the future dangerousness issue. He specifically points to his lack of significant criminal history, the character testimony in his favor, and his lack of disciplinary history while awaiting trial.

A jury may consider a variety of factors when determining whether a defendant will pose a continuing threat to society. *Wardrip v. State*, 56 S.W.3d 588, 594 & n.7 (Tex. Crim. App. 2001); *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). For example, the facts of the offense alone may be sufficient to sustain the jury's finding of future dangerousness. *Fuller v. State*, 253 S.W.3d 220, 231-32 (Tex. Crim. App. 2008); *Sonnier v. State*, 913 S.W.2d 511, 517 (Tex. Crim. App. 1995); *Kunkle v. State*, 771 S.W.2d 435, 449 (Tex. Crim. App. 1986). We must view all of the evidence in the light

most favorable to the jury's finding and determine whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found beyond a reasonable doubt that the answer to the future dangerousness issue was "yes." *Ladd v. State*, 3 S.W.3d 547, 557-58 (Tex. Crim. App. 1999).

The jury heard a variety of testimony during the punishment phase. Over forty witnesses testified on appellant's behalf. His former employer and teachers, friends, customers of his father's welding shop, family members, and friends' parents all described appellant as polite and respectful. Former teachers testified that he was an average student, quiet, and had no discipline problems. Customers told the jury that appellant was earnest and courteous. The defense witnesses testified that this offense was completely out of character for appellant and that they were shocked he was involved. The arresting officers in this case testified that appellant was cooperative once he was in custody, and jailors testified that appellant was peaceful and had no disciplinary problems while awaiting trial.

On cross-examination, however, there was testimony that appellant was easily irritated and angered and quick-tempered. His temper was unpredictable, and he had inappropriate reactions to stressful circumstances. Additionally, the jury learned that the neuropsychologist, Dr. Daneen Milam, was told that when appellant lost his temper and had an outburst, it would seem like he was unable to hear what anyone was saying to him. Several defense witnesses also described how appellant's behavior had changed in the

months preceding the offense. They described appellant as becoming withdrawn and not participating in activities as he once had.

According to Milam, who interviewed and tested appellant, he was not exhibiting signs of depression at the time of his interview. However, in her review of prior interviews and records, she saw a pattern of clinical depression beginning about a year before the offense. Milam also testified that she found no evidence of brain damage and that, by all accounts, appellant had a happy childhood. Milam told the jury that appellant had a progressive history of alcohol abuse, evidenced by his history of alcohol-related incidents, which included a Minor in Possession citation and a Minor Driving Under the Influence citation.

Various law enforcement officers testified that appellant had also been cited for driving his all-terrain vehicle on the roadway and in a creek bed, for speeding 114 mph in a 70 mph zone, and for having an illegal tint on his truck windows. At the time of the offense, appellant was serving a probated sentence for DWI, but he had not been successfully completing the terms of his probation. He had been notified by his probation officer that a motion to revoke his probation would be filed. According to Milam, appellant stated that he "didn't care whether [he] lived or died." He related to Milam that he had a short temper and would do things such as throwing a hammer to relieve stress, but that while such actions relieved some of his stress, they did not solve any of his problems.

The jury learned during the guilt phase that appellant had reported to Dr. Jerome Brown that he shot at the officers because he was mad. While appellant told Texas Ranger David Maxwell that he felt terrible that he had killed the game warden, Maxwell testified that appellant did not seem remorseful. Appellant's answers to an anger-control survey revealed that he had "snapped" and broken things while angry. Appellant also related on the survey that he had done things in anger that he was unable to remember the next day. On the Inventory of Offender Risk, Needs, and Strengths (IORNS test), appellant scored high in the areas of irresponsibility, manipulativeness, angry detachment, and hostility.

The jury also had before it the facts of the offense. Rather than pulling over when Blackburn activated his red-and-blue lights, appellant sped away, leading Blackburn and other officers on a chase that reached speeds of 130 mph. Once officers successfully disabled appellant's truck, rather than stopping and peacefully surrendering, appellant exited his truck and fired a handgun at officers. Appellant then deliberately exchanged his handgun for a semi-automatic assault rifle. He raised the assault rifle to his shoulder and began firing at officers with metal-piercing bullets. Appellant then aimed his rifle at Justin Hurst and fired. Hurst did not survive.

Appellant relies on this Court's decision in *Berry v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007), to support his argument that, despite the evidence heard by the jury, he would not pose a continuing threat to society within prison. We understand appellant to

argue that *Berry* should be read to require the jury to consider, within its future dangerousness determination, whether a capital defendant sentenced to life imprisonment would be a continuing threat to prison society. This Court has interpreted the future dangerousness special issue to ask whether a defendant would be a continuing threat "whether in or out of prison." *Estrada v. State*, 313 S.W.3d 274, 281 (Tex. Crim. App. 2010) (quoting *Druery v. State*, 225 S.W.3d 491, 507 (Tex. Crim. App. 2007)); *see also Broxton v. State*, 909 S.W.2d 912, 919 (Tex. Crim. App. 1995) (adopting the reasoning of the plurality opinion in *Smith v. State*, 898 S.W.2d 838, 846 (Tex. Crim. App. 1995) (plurality op.), which stated that the term "society" includes both the prison and non-prison populations). Appellant's reasoning does not persuade us that our interpretation of "society" is in error.

Having viewed all of the evidence in the light most favorable to the jury's finding, we determine, based on that evidence and reasonable inferences therefrom, that a rational jury could have found beyond a reasonable doubt a probability that appellant would pose a continuing threat to society. Point of error two is overruled.

## JURY ARGUMENT

Appellant complains that the trial court erred in overruling his objections to the prosecutor's arguments at the close of both the guilt and punishment phases of trial. This Court has stated that proper jury argument generally falls within one of four areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to an

argument of opposing counsel, and (4) plea for law enforcement.  *Brown v. State*, 270

S.W.3d 564, 570 (Tex. Crim. App. 2008).

In point of error three, appellant complains that it was harmful, reversible error

when the prosecutor compared him to a serial killer and described his experts as "hired

guns" during the State's closing arguments at the guilt phase.  Appellant first complains

of the following comments:

> [Prosecutor]: Let's talk about the psychological testimony for a minute.
> The testimony was he wasn't seriously depressed.  He does
> score a one on part of the test, same as serial killers score.

Defense counsel objected, and the trial court overruled the objection.

Previously, Brown testified on cross-examination that appellant scored a "1" on

the Warmth Primary Factor Scale of the Sixteen Personality Factors Questionnaire,

scoring as "reserved, detached, [and] formal."  The prosecutor asked Brown "[w]here

would someone who was a serial killer score on that scale?"  Brown responded that he

thought that "they would score at the low end on that scale."  Brown agreed with the

prosecutor that a "1" is the low end of the scale.

The prosecutor's argument to the jury that appellant scored similarly to serial

killers on one part of the test was a reiteration of Brown's testimony and thus falls within

one of the areas of proper jury argument.  The trial court did not err in overruling

appellant's objection to the prosecutor's argument.

Appellant also complains of the following argument:

[Prosecutor]: So, what happened? You got a man who nobody tells what to do in a situation where he knows he's fixing to have to do exactly what he doesn't want to do. And now you know, after hearing from his own mom and dad, and his own hired defense experts what kind of –

Defense counsel objected to "the comment about hired experts." In his brief, appellant argues that the prosecutor described his experts as "hired guns." The record reflects that the prosecutor did not use this specific term. In any event, the trial court sustained appellant's objection to the prosecutor's reference to "hired experts" and instructed the jury to disregard the prosecutor's comment. Appellant's motion for mistrial was denied.

An instruction to disregard will generally cure error if a prosecutor mentions facts outside the record. *See Gamboa v. State*, 296 S.W.3d 574, 580 n.12 (Tex. Crim. App. 2009). In this case, the fact that the defense experts were hired was not outside the record. Both of the defense experts revealed their payment during cross-examination. Further, when the prosecutor resumed her closing following the complained-of argument, she reiterated without objection: "Dr. Jerome Brown and Vivian Lord both told you they made over $3,000."

Even if the prosecutor's statement that appellant had "hired experts" was improper, that statement was not so extreme that the trial court's instruction to disregard was ineffective. Accordingly, we find that the trial court's instruction to disregard the prosecutor's comment cured any error. Point of error three is overruled.

In point of error four, appellant alleges that the trial court erred in overruling his objection to the prosecutor's argument at the guilt phase that he tried "to commit the worst criminal act on law enforcement ever in the United States' history." The prosecutor argued to the jury:

> [Prosecutor:] [Appellant] did everything he could to try and kill every officer that was out there that night. And just because some metal on a car saved some lives, and just because a couple of his angled shots didn't quite ring true, he doesn't get the benefit of that. He tried with all he could to massacre seven officers, to commit the worst criminal act on law enforcement ever in the United States' history.

Defense counsel objected that the prosecutor's argument was "purely outside the record and not supported" and that it was not a reasonable deduction from the evidence. The trial court, while overruling the objection, took the opportunity to *sua sponte* remind the jury that, "[T]his is argument. This is not evidence."

A prosecutor may not use closing arguments to present evidence that is outside the record. Improper references to facts that are neither in evidence nor inferable from the evidence are generally designed to arouse the passion and prejudice of the jury and, as such, are inappropriate. *Borjan v. State*, 787 S.W.2d 53, 57 (Tex. Crim. App. 1990). The complained-of argument referred to facts (criminal acts against law enforcement in United States history) that were neither in evidence nor inferable from the evidence. Therefore, the argument was improper, and the trial court erred in failing to sustain appellant's objection to the argument.

Our inquiry does not end here, however. Improper-argument error of this type is non-constitutional in nature, and a non-constitutional error "that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b); *Martinez v. State*, 17 S.W.3d 677, 692-93 (Tex. Crim. App. 2000). To determine whether appellant's substantial rights were affected, we balance the severity of the misconduct (*i.e.*, the prejudicial effect), any curative measures, and the certainty of conviction absent the misconduct. *Martinez*, 17 S.W.3d at 692-93; *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

The prosecutor's comments were a very small portion of the State's entire closing argument at the guilt phase. The State did not emphasize the comments. Viewing the State's closing argument as a whole, we cannot conclude that there was a willful and calculated effort to deprive appellant of a fair and impartial trial. Further, viewing the record as a whole, we cannot conclude that appellant was prejudiced by the prosecutor's comments.

While the trial court did *sua sponte* remind the jury that closing arguments were not evidence, there was no curative instruction. However, the evidence presented during the guilt phase showed quite clearly that appellant was responsible for the murder of a peace officer discharging his duties and for attempting to shoot many other officers. Given the brevity of the prosecutor's comments, the lack of prejudice, and the strength of

the evidence supporting appellant's conviction, we find that any errors associated with those comments were harmless. Point of error four is overruled.

In point of error five, appellant claims that the prosecutor improperly argued that "the consequences of a conviction for killing a police officer was (sic) always a death sentence" which is "contrary to existing 'capital murder law' as defined by the [United States] Supreme Court." During the State's closing argument at the punishment phase, the prosecutor argued to the jury:

> The very first definition of capital murder in the State of Texas is the killing of a peace officer in the lawful discharge of his duty acting in the line of duty. The very first one.
>
> Why do you think that is? Think maybe it might be because even criminals need to know what the consequence is when you kill a cop? We were all raised to know what it means. All of us, including the defendant, knows what ought to happen when you choose to gun down a cop. Because, see, when you don't have that consequence, then what's going to happen to our society?
>
> And that law – this law of capital murder that we have, when this sort of tragedy and crime happens, they have the right to know that every day when they get up and they go to work, we understand what they're doing. We appreciate what they're doing. And we know that they're putting their lives on the line and making that sacrifice for us every single day.
>
> And they have the right to know that we believe that when someone guns down one of them, who is only trying to protect us, what's going to happen to them?
>
> And their wives and their mothers and their fathers need to also know that we appreciate the sacrifice that they make every day of their life. And defendants need to know that when you kill a cop, that is unacceptable. It is not tolerated. And it's certainly not going to be tolerated in Wharton County, Texas.

Because if that's not the consequence defense [sic], then where are we? Defense counsel objected that the prosecutor was asking jurors to negate their obligation and automatically answer the special issues in a way that appellant would receive the death penalty because a peace officer was killed. The prosecutor responded that she was making a plea for law enforcement, and the trial court overruled the objection.

The State is generally not permitted to argue that the community or any segment of the community demands or is expecting a certain verdict or punishment. *Cortez v. State*, 683 S.W.2d 419, 420-21 (Tex. Crim. App. 1984). On the other hand, the State is not prohibited from addressing the concerns of the community. *Borjan*, 787 S.W.2d at 55-56. For example, the State may argue the relationship between the jury's verdict and the general deterrence of crime. *Id.* at 55. The State may also argue that juries should deter certain crimes by their verdicts. *Id*.

The prosecutor referred to "the consequence" of killing a police officer and followed with asking, "[W]hen you don't have that consequence, then what's going to happen to our society?" Within the complained-of argument, she asked the jury to send a deterrent message to criminals that killing a peace officer is unacceptable. This is similar to arguments that we have permitted in the past.

We find nothing in the complained-of remarks to reflect that the prosecutor was asking the jury to forgo its duty and automatically answer the special issues in such a way that appellant would receive the death penalty because the victim was a peace officer.

Appellant was found guilty of the capital murder of a peace officer, and one of the possible punishments for that offense is the death penalty. The complained-of argument was a mere plea for law enforcement, and the trial court did not err in overruling appellant's objection. Point of error five is overruled.

## CONSTITUTIONALITY OF TEXAS PENAL CODE

In point of error six, appellant alleges that the "Texas capital murder statute regarding the killing of a peace officer in the course of his duties is unconstitutional as applied and on its face." Appellant argues that Section 19.03(a)(1) of the Texas Penal Code, as interpreted by this Court, is facially unconstitutional for failing to limit the scope of the aggravator to the ordinary and commonly accepted meaning of "lawful."[3] Appellant further argues that a rational juror might have deemed the officers' decision and efforts to arrest and detain appellant to be reckless or negligent rather than "lawful" under the facts and circumstances of this case.

In his brief, appellant asserts that these complaints were timely raised in an oral motion for directed verdict and by written motions prior to trial. Appellant fails to identify in which written motions these complaints were raised. He also does not provide citation to the record for the oral motion for directed verdict. Thus, this point of error is inadequately briefed. *See* TEX. R. APP. P. 38.1.

---

[3]Section 19.03(a)(1) of the Texas Penal Code provides that a person commits the offense of capital murder if he murders a peace officer "who is acting in the lawful discharge of an official duty and who [he] knows is a peace officer."

Nevertheless, in the interest of justice, the Court has examined the record. A review of the clerk's record revealed that appellant filed one pretrial motion to declare Article 37.071 of the Texas Code of Criminal Procedure facially unconstitutional and a second pretrial motion to declare Article 37.071 unconstitutional as applied. The first motion does not contain any reference to Texas Penal Code Section 19.03. In the second motion, appellant discusses the expansion of capital crimes from five in 1974 to eleven at the present time. He discusses the definition of "individual" and the law of parties, but nowhere within this or any other motion does he complain that the scope of the aggravator in Section 19.03 should be limited to the ordinary and commonly accepted meaning of "lawful" as he does in his brief on appeal.

Additionally, a review of the reporter's record revealed that, at the time the State rested, appellant requested a directed verdict simply by stating, "[a]sk for instructed verdict of acquittal at this point." Appellant did not complain of the constitutionality of Texas Penal Code Section 19.03 or request a limitation of the meaning of "lawful" as he does on appeal. This point of error has not been properly preserved for appellate review. *See* TEX. R. APP. P. 33.1. Point of error six is overruled.

## VOIR DIRE

In point of error seven, appellant complains that the trial court "continually den[ied] defense counsel's attempts to explore mercy as a consideration during the individual voir dire." Appellant argues that because "[m]ercy is a permissible factor in

determining and evaluat[ing] mitigation in a capital context[,]" it was improper for the trial court to sustain the State's objections. He claims that the trial court "essentially forbade" appellant from exploring potential jurors' responses to the concept of mercy. He specifically cites to the individual voir dire of three potential jurors as examples of the trial court's errors. Appellant claims that because the trial court prohibited inquiry on the topic of mercy, he had no ability to intelligently use his peremptory challenges or make challenges for cause.

In order to show harm, applicant must show that (1) he exhausted all of his peremptory challenges, (2) he requested more challenges, (3) that request was denied, and (4) he identified "an objectionable person seated on the jury on whom he would have exercised a peremptory challenge." *Sanchez v. State*, 165 S.W.3d 707, 712 (Tex. Crim. App. 2005). Even if this Court were to assume that appellant properly preserved this issue and the trial court erroneously prevented him from exploring the concept of mercy as a consideration for mitigation, appellant has not shown harm. The record reflects that appellant used only twelve of his fifteen peremptory challenges during selection of the jury panel and used one peremptory challenge during the selection of alternate jurors. Appellant has not shown that he was forced to accept any objectionable jurors. Point of error seven is overruled.

## CONSTITUTIONALITY OF ARTICLE 37.071

In point of error eight, appellant alleges that the Texas death penalty scheme is unconstitutional because jurors cannot be told of the effect of even one life vote. He also briefly complains of the 10-12 Rule. We have previously rejected these allegations. *See, e.g., Lawton v. State*, 913 S.W.2d 542, 558-59 (Tex. Crim. App. 1995). We decline to overrule our precedent in this area. Point of error eight is overruled.

In point of error nine, appellant alleges that the Texas death penalty scheme is unconstitutional because it does not provide for the definition of "key terms" and the jury is left unguided as to the meaning of those terms. Appellant, however, does not identify which "key terms" he believes should have been defined for the jury's guidance. This point of error is inadequately briefed. TEX. R. APP. P. 38.1. Point of error nine is overruled.

## INDICTMENT

In point of error ten, appellant complains that the indictment against him is void under the Texas Constitution "for failing to provide the grand jury with the allegations which would warrant a sentence of death." Appellant asserts that because the grand jury did not participate in the decision to seek the death penalty, he has been denied his right to due course of law under the Texas Constitution. Appellant argues that "in order to prevent unusual application of the death penalty, and in order to provide the guarantees accorded under the State constitution, this must require the use of the grand jury to review the prosecutor's decision to seek death, and must of necessity place the facts relied upon

to answer the Special Issues before the grand jury, or else the guarantees are meaningless." As support for his argument, appellant points to the language of Article I, Sections 10 and 13, of the Texas Constitution, as well as this Court's opinion in *Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991).

Article I, Section 10, of the Texas Constitution provides that no person shall be held to answer for a criminal offense except by indictment returned by a grand jury. Article I, Section 13, states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted. All courts shall be open, and every person for an injury done him, in his lands, goods, person, or reputation, shall have remedy by due course of law."

This Court has previously found that the United States Constitution does not compel the State to allege the special issues under Article 37.071 in the indictment and does not require that the grand jury pass on the punishment special issues when deciding whether to indict a defendant. *Roberts v. State*, 220 S.W.3d 521, 535 (Tex. Crim. App. 2007); *Russeau v. State*, 171 S.W.3d 871, 885-86 (Tex. Crim. App. 2005); *Rayford v. State*, 125 S.W.3d 521, 533 (Tex. Crim. App. 2003). Appellant points out that we may interpret our State constitutional guarantees more broadly than those contained in the United States Constitution. *See Heitman*, 815 S.W.2d at 685-88. He generally argues that we should do so here because (1) the Texas Bill of Rights is not an amendment but an integral part of the framework of the Texas Constitution, (2) the Texas Bill of Rights "is

placed first in [the Texas Constitution]," and (3) "[the Texas Constitution] was never intended to be subservient to the federal [constitution]." However, he does not specifically explain how the protections offered by the Texas Constitution differ from the protections guaranteed by the United States Constitution. We are not inclined to make appellant's arguments for him. Tex. R. App. P. 38.1. Point of error ten is overruled.

## MOTION FOR NEW TRIAL

In points of error eleven and twelve, appellant alleges that the trial court erred in refusing to grant a hearing on his motion for new trial on the following grounds: (1) there was unauthorized communication between the bailiff and the jury that violated his Sixth Amendment right to an impartial jury, and (2) the future dangerousness question violates due process.

This Court has set out the applicable standard of appellate review:

> When examining a trial court's denial of a hearing on a motion for new trial, we review for an abuse of discretion. In so doing, we reverse only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. And, in the absence of [such] an abuse of discretion, this Court would not be justified in reversing the judgment. Our review, however, is limited to the trial judge's determination of whether the defendant has raised grounds that are both undeterminable from the record and reasonable, meaning they could entitle the defendant to relief. This is because the trial judge's discretion extends only to deciding whether these two requirements are satisfied.

*Gonzales v. State*, 304 S.W.3d 838, 842 (Tex. Crim. App. 2010) (quoting *Smith v. State*, 286 S.W.3d 333, 339-40 (2009) (internal quotations marks and footnotes omitted)).

In his motion for new trial, appellant complained, among other things, of an alleged unauthorized communication between the bailiff and the jury. Attached to the motion was an affidavit from juror Salinas, in which Salinas stated:

> During deliberation there were times where [sic] our discussions were loud. One incident during the punishment phase I remember arguing with the Jury Foreman and the bailiff of the court banged on the door. The door was out of my view and either the foreman or another juror let him in. He then told the Jurors to keep it down, it was too loud and they could hear the shouting in the deliberation room. I stopped my argument at that time.

Appellant argues that a hearing was necessary because "the bailiff did not have the authority to interfere with the jury's deliberations by telling the jury to hold their voices down." Appellant asserts that this was an unauthorized communication because it was without judicial authority and without the consent of the trial court. He further asserts that a hearing would have shown that the jury room was isolated in a bank conference room on the second floor of a building across the street from the court. He argues that a hearing would have shown that the jurors' raised voices would not have disturbed anyone and could not have been heard by anyone.

In support of his contentions, appellant only cites to *Parker v. Gladden*, 385 U.S. 363 (1966), a case in which the United States Supreme Court found that a bailiff's communications with jurors were in violation of the Sixth Amendment's confrontation requirement and right to trial by an impartial jury. *Id*. at 365. In *Parker*, the bailiff told one juror, within the presence of at least one other juror, that the defendant was a "wicked fellow" who was guilty and then told another juror that "the supreme court" would correct

any error in finding the defendant guilty. *Id*. at 363-64. The United States Supreme Court found that the bailiff's actions "involve[d] such a probability that prejudice [would] result that it [was] deemed inherently lacking in due process." *Id*. at 365 (quoting *Estes v. Texas*, 381 U.S. 532, 542-43 (1965)).

The instant case is significantly different from *Parker*. In this case, the bailiff made no comment to jurors regarding the law or the substance of the case. He made no comments regarding appellant's death worthiness, nor did he make any attempts to influence the jury's punishment determination. The bailiff's direction to jurors to keep their voices down so that they could not be heard from outside the jury room did not implicate appellant's right to an impartial jury. The trial court did not abuse its discretion in denying a hearing on this ground. To the extent that appellant is arguing any other issue, he has not briefed it. *See* TEX. R. APP. P. 38.1. Point of error eleven is overruled.

Appellant also complains that the trial court refused to grant a hearing on the ground that the future dangerousness special issue violates due process. Appellant argues that the jury was unable to make a future dangerousness determination from the evidence it had before it. He claims that "it is clear" that "'society,' in the case of a person already convicted of a criminal charge of capital murder, is prison." He argues that the jury in his case did not have the benefit of recent research indicating that the State's predictive evidence of future dangerousness is "almost always wrong." Appellant also claims that the jury did not have any insight into the prison system or the ways the prison system

"was set up to contain any hint of future problems" that appellant may present. This Court understands appellant's argument to be that the evidence was legally insufficient to support the jury's future dangerousness determination and that the trial court failed to hold a hearing on that issue.

Our review of the trial court's decision to grant or deny a hearing is "limited to the trial judge's determination of whether the defendant has raised grounds that are both undeterminable from the record and reasonable, meaning they could entitle the defendant to relief." *Gonzales,* 304 S.W.3d at 842. As discussed in the Future Dangerousness section, *supra*, this Court has stated that a jury may consider a variety of factors in making its future dangerousness determination. *See Wardrip*, 56 S.W.3d at 594 & n.7; *Keeton*, 724 S.W.2d at 61. This Court has never held that a jury must have before it expert testimony regarding the prison classification system or any prison procedures to prevent disciplinary incidents or discipline problem inmates. We have repeatedly stated that the facts of an offense alone may support an affirmative future dangerousness finding. *See Fuller*, 253 S.W.3d at 231-32; *Sonnier*, 913 S.W.2d at 517; *Kunkle*, 771 S.W.2d at 449. We have also stated that "society" includes both prison and non-prison populations. *See Estrada*, 313 S.W.3d at 281; *see also Broxton*, 909 S.W.2d at 919.

Because this was not a ground that could entitle appellant to relief, the trial court did not abuse its discretion in refusing to grant a hearing on the ground that the future dangerousness special issue violates due process. Point of error twelve is overruled.

We affirm the judgment of the trial court.

Meyers, J.

Delivered: March 16, 2011

Publish