

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

### NO. 02-12-00345-CR

RODNEY D. GLADNEY                                                      APPELLANT

V.

THE STATE OF TEXAS                                                              STATE

----------

## FROM COUNTY CRIMINAL COURT NO. 1 OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

In one issue that concerns the trial court's decision to overrule his objections to the State's closing argument in the punishment phase of his trial, appellant Rodney D. Gladney appeals his sentences for seven counts of cruelty to livestock animals.[2]  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. Penal Code Ann. § 42.09(a)(2), (b)(5)(B), (c) (West 2011).  In his prayer, appellant does not ask us to reverse his convictions, but he requests that we "remand this case to the trial court for a new trial on punishment."

## Background Facts

The State charged appellant with seven counts of cruelty to livestock animals by intentionally or knowingly failing to provide necessary food, water, and care to seven horses.[3]  Appellant pled not guilty to all of the counts.  At appellant's trial, the State presented evidence that in 2010, he had owned several malnourished horses and had not provided them with adequate food or care over the course of that year.[4]

For example, Stephanie Pienta, an animal control officer with the City of Denton, testified that in December 2010, the

> horses were very skinny. . . .  [O]ne of them had [birthed] a baby.
> [The foal's] back legs were severely deformed from malnutrition.
> The mom was on the ground.  She could not get up.  The [foal] was
> trying to nurse from her. . . .  [S]he was in bad shape.

Pienta explained that the horses were not in good health in January 2010 and that they significantly deteriorated between then and December 2010, when Denton County law enforcement officers seized them.  Kirk Sissney, the animal crimes investigator with the Denton County Sheriff's Office, testified that in December 2010, the horses' hooves were cracked, their teeth appeared to look unhealthy, and they were thin enough that their spines could be seen.  A

---

[3]The charging instrument originally contained ten counts, but the State waived three of the counts at trial.

[4]Appellant called witnesses who testified that the horses did not belong to him.

2

veterinarian testified that the nursing mare was hypoglycemic and was struggling to lactate, and she also testified that some of the horses had parasites.

After listening to testimony from six witnesses and considering the arguments of the parties, a jury convicted appellant of all seven counts of cruelty to livestock animals. During the punishment phase of the trial, the trial court admitted documents establishing that appellant had been previously convicted of several other misdemeanor offenses, including driving while intoxicated, possessing less than two ounces of marijuana, and assault. After a witness testified about appellant's failure to satisfy certain conditions of community supervision for assault against a family member, the State recalled Deputy Sissney, and the following exchange occurred on direct examination:

> *Q.* Deputy Sissney, I know you testified earlier in this trial about what it takes when you're seizing an animal, and your training and experience with horses in particular. Now I want to ask you, do you have any experience when it comes to after the seizure process --
>
> *A.* Yes.
>
> *Q.* -- when it comes to horses?
>
> *A.* Yes, ma'am.
>
> *Q.* Could you tell the jury a little bit about those duties?
>
> *A.* Usually when we're dealing with a seizure-type situation, you're dealing with an animal that has a 1.5 body mass index, a 2.5 body mass index. There's a lot of care that goes into bringing that animal back to a point of health. On average, to raise an animal's body condition score two -- two levels, two points, is about 45 days and about $10,000.

*Q.* And what body score are you looking at when you're trying to get them back to good health?

*A.* . . . [A]t least a 4, because that means that we have put some muscle and fat back on the body to allow them to be able to progress naturally from that point . . . .  We kind of have to baby them to that point.  About a 4 is about where we're . . . aiming for.

. . . .

*Q.* In this particular case with Rodney Gladney involving seven horses, were y'all -- was the County able to save these horses?

*A.* Yes, ma'am.

In responding to the first question on cross-examination by appellant's counsel, Deputy Sissney confirmed that it takes about $10,000, on average, to "restore one of *those horses* back to health."  [Emphasis added.]  The immediately preceding questions on the State's direct examination, which particularly concerned appellant's horses, and the immediately subsequent question by appellant's counsel on cross-examination indicate that by using the phrase "those horses," appellant's counsel meant the horses related to appellant's charges.[5]

Toward the end of the State's closing argument on appellant's punishment, after the prosecutor had discussed appellant's culpability for the offenses and his

---

[5]Specifically, immediately after asking about the cost of restoring one of "those horses" to good health, appellant's counsel asked, "Do you know whether or not the condition of *those horses* was the result of someone knowingly and intentionally wanting to be cruel to them, or perhaps might have been the result of their inability financially to maintain *those horses* in a good state of health?" [Emphasis added.]

criminal history, the jury heard the following colloquy between the prosecutor, appellant's counsel, and the trial court:

> [THE STATE:]  Let's talk about some other numbers.  $10,000 per horse to pay for the choices that he made.  That's $70,000 that was spent by members of this community.

> [DEFENSE COUNSEL]:  Your Honor, I object.  That's outside the record.

> THE COURT:  I'll overrule the objection.

> [THE STATE]:  $70,000 spent by members of our community --

> [DEFENSE COUNSEL]:  Your Honor, I object --

> [THE STATE]:  -- to fix what he did.

> [DEFENSE COUNSEL]:   -- again to stating that the County has spent a dime.

> THE COURT:  Uh, don't – don't testify.

> [DEFENSE COUNSEL]:  All right.  I object again, outside the record.  And I'd like --

> THE COURT:  Overruled.

> [DEFENSE COUNSEL]:  I'd like a running objection to similar argument.

> THE COURT: Overruled.

> . . . .

> THE COURT: And you can have a running objection as to that.

> . . . .

> [THE  STATE]:   . . .   Remember  these  numbers. . . . Remember seven horses, $70,000.  Send that man to jail.  Make him learn his lesson.  He's had enough chances.

5

The jury assessed appellant's punishment at 270 days' confinement and a $3,000 fine. The trial court sentenced appellant accordingly, and he brought this appeal.

## The Propriety of the State's Closing Argument

In his only issue, appellant contends that the trial court erred by overruling his objections to the portion of the State's closing argument on punishment that we have quoted above. Appellant contends that the State's argument fell outside of the scope of the evidence that the parties had presented.

To be permissible, the State's jury argument must fall within one of the following four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; or (4) plea for law enforcement. *Felder v. State*, 848 S.W.2d 85, 94–95 (Tex. Crim. App. 1992), *cert. denied*, 510 U.S. 829 (1993); *see Gallo v. State*, 239 S.W.3d 757, 767 (Tex. Crim. App. 2007), *cert. denied*, 553 U.S. 1080 (2008). Counsel "may not use closing arguments to present evidence that is outside the record. Improper references to facts that are neither in evidence *nor inferable from the evidence* are generally designed to arouse the passion and prejudice of the jury and, as such, are inappropriate." *Freeman v. State*, 340 S.W.3d 717, 728 (Tex. Crim. App. 2011) (emphasis added), *cert. denied*, 132 S. Ct. 1099 (2012).

However, counsel "is generally afforded wide latitude in drawing inferences from the record, as long as such inferences are reasonable and offered in good faith." *Cantu v. State*, 842 S.W.2d 667, 690 (Tex. Crim. App. 1992), *cert. denied*,

6

509 U.S. 926 (1993); *Denison v. State*, 651 S.W.2d 754, 761–62 (Tex. Crim. App. 1983) ("Counsel is given wide latitude without limitation in drawing inferences from the evidence so long as they are reasonable, fair, legitimate, and offered in good faith."); *see also Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007) ("[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them."). For example, in *Estes v. State*, the evidence established that the defendant had entered into a victim's house to steal a VCR and that at the time of the defendant's entry, the victim had been asleep in the room containing the VCR. 873 S.W.2d 771, 772 (Tex. App.—Fort Worth 1994, pet. ref'd). Given these facts, we held that the State could permissibly argue during the punishment phase, as a reasonable deduction from the evidence, that the defendant had seen the victim while stealing the VCR, even though there was no direct evidence that the defendant had seen the victim. *Id.*

The State contends that its challenged argument at trial was a reasonable deduction from the evidence. We agree. The jury heard evidence during the guilt and punishment phases of appellant's trial that over the course of a year leading up to December 2010, the seven horses at issue became severely malnourished to the point of being skeletal; that in December 2010, according to the veterinarian who examined the horses, they scored at 1 to 2.5 on a body condition scale that ranged from 1 to 9; that the horses were seized by Denton County officials in December 2010; that a horse with a body condition score of 1

7

or 2 requires a "lot of care" and approximately $10,000 to bring back to health by raising the score two points; that the $10,000 figure applied to the condition of the horses related to appellant's crimes; and that Denton County was able to "save" those horses. Tying these facts together, we conclude that the prosecutor could reasonably deduce, and could therefore properly argue over appellant's objections, that "$70,000 . . . was spent by members of [the] community" to remediate the damage caused through appellant's crimes of cruelty to the horses. *See Gallo*, 239 S.W.3d at 767; *Cantu*, 842 S.W.2d at 690; *cf. Calderon v. State*, 950 S.W.2d 121, 133–34 (Tex. App.—El Paso 1997, no pet.) (holding that the State could properly argue that a defendant was a main drug dealer in a small town based on the cumulative effect of facts that the State had presented at trial).

Moreover, even if the trial court had erred by overruling appellant's objections, we conclude that the error would not be reversible because the argument was not extreme or manifestly improper and because, in light of the evidence presented during the guilt and punishment phases of appellant's trial, including the facts of appellant's offenses and his criminal history, the argument did not affect appellant's substantial rights. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008) (citing *Allridge v. State*, 762 S.W.2d 146, 155 (Tex. Crim. App. 1988)), *cert. denied*, 129 S. Ct. 2075 (2009); *see Freeman*, 340 S.W.3d at 728 (characterizing an argument that improperly disclose.s facts that are outside the record as nonconstitutional error and stating that under rule of appellate

8

procedure 44.2(b), the error must be disregarded unless it affected the appellant's substantial rights).

For these reasons, we overrule appellant's only issue.

## Conclusion

Having overruled appellant's sole issue, we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DAUPHINOT, J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  June 13, 2013