**Affirm and Opinion Filed July 29, 2013**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-00631-CR

## JZACQUANE HICKMAN, Appellant
V.
## THE STATE OF TEXAS, Appellee

**On Appeal from the 203rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F10-60332-P**

## MEMORANDUM OPINION

Before Justices FitzGerald, Francis, and Lewis
Opinion by Justice Francis

A jury convicted Jzacquane Hickman of capital murder, and the trial court assessed a mandatory life sentence without parole. In his sole issue, appellant contends the trial court reversibly erred by allowing the prosecutor to make an improper jury argument. We affirm.

In the early morning hours of September 6, 2010, fifteen-year-old Sasha Bernal and her ex-boyfriend, Kenneth Moore, were shot multiple times; Moore died from his wounds. At trial, Bernal testified Moore was a drug dealer who sold "weed." She said she was in the back bedroom when someone came into the house. She could hear Moore talking to someone and, after a couple of minutes, she heard gunshots. In an attempt to hide, Bernal knelt beside the bed. Moore ran into the bedroom; he was bleeding and had been shot. The shooter followed him and

shot Bernal in the head. Bernal was also shot two more times, and Moore was shot several more times. Bernal and Moore were lying beside each other on the floor, and a second man came into the room. The men checked Moore's pockets and left. Bernal did not get up immediately because she was scared. At some point, Moore stopped breathing. Bernal said she then tried to walk to her friend's house down the street to get help. She collapsed, and a man helped her and called the police. Bernal was taken to the hospital.

While in the hospital, Bernal said she talked to the police and told them she could identify the person who shot her. She described him as "bright," or having "light skin," and said he had a BMR tattoo on his left forearm. She told the police she recognized him as someone she had seen several times in the neighborhood; at trial, she said she had also seen him before at Moore's house. The police showed her a photographic lineup, and she selected appellant's photograph. At trial, Bernal identified the appellant.

Bernal said she knew Moore as "Marvin," "Jaw," and "Rude Boy," but she did not know him by "Jamaican Marvin." She acknowledged that "all he did" was "sling dope." She also acknowledged Moore had been robbed at some point before his murder. She was asked about inconsistencies between her testimony and her statement to the police. Specifically, in her police statement, she said she was in the back bedroom when she heard the door open. She said she walked in the kitchen and saw a black man, who she identified at trial as appellant, talking to Moore. In the statement, she said the man pulled a gun and shot twice at Moore. She said Moore ran into the bedroom and pushed her down. At trial, Bernal clarified she never left the bedroom during the shooting but could see appellant shoot Moore from where she was seated on the bed. She said Moore did not push her down when he came in the room, because she was already kneeling on the floor. Bernal said she might not have been "clear on everything" in the

statement because she was unable to write. Bernal said she would never forget the person who shot her because she was looking at him. She acknowledged BMR stands for "Blood Money Records," and said she "guess[ed] so" when asked if Moore had a lot of enemies. Bernal said that at the time of the shootings, Moore had a gun on the bed. She called it a "chopper" because it was "big."

A crime scene analyst testified he found two types of cartridge casings in the house, meaning two different weapons were used in the shootings. Cartridge casings were found in the living room, kitchen, near the bedroom door, and in the bedroom itself. The medical examiner testified Moore sustained seven gunshot wounds to his aorta, lung, liver, and stomach.

Detective Steven David testified he met with Bernal while she was in the hospital and took her statement. He put together a photographic lineup for Bernal. He selected photographs of men who looked like appellant rather than people from the neighborhood who had a BMR tattoo but looked nothing like appellant. Once Bernal identified appellant, he prepared an arrest warrant. When appellant was arrested five days after the murder, his BMR tattoo had been recently covered by a fresh tattoo. Detective David could tell the tattoo was recent because of the "little blood scabs" on his arm. He agreed with defense counsel's characterization of Moore as a "pretty notorious dope slinger." When asked by defense counsel if the police had a "long list of suspects" that had been interviewed in the case that "had nothing to do with BMR" with "motives and reasons" to kill Moore, Detective David acknowledged he had talked to numerous people. He also agreed that his notes showed "a whole bunch of names" with "different motivations" to kill Moore. But, other than appellant, none of the other people he talked to had a BMR tattoo on his forearm nor did any have a fresh tattoo covering a BMR tattoo. Finally, Detective David believed a robbery was in progress when Moore was shot, given the information

3

provided by Bernal. The gun, or "chopper," that was on the bed at the time of the shootings was missing. Detective David believed it was an AK-47 assault rifle. He was never able to identify the second suspect.

Detective Barrett Nelson testified he worked in the Dallas gang unit for fourteen years. He was familiar with BMR, or "Blood Money Records," which he said was a "[s]mall group of individuals." During the murder investigation, Detective David contacted him for assistance in locating appellant to serve the arrest warrant. Detective Nelson said he talked to appellant's family and friends and printed out wanted posters, which he placed throughout the neighborhood and in locations where BMR members were likely to hang out. He found appellant five days later and arrested him. At the time, he said appellant had Vaseline over the area of a fresh tattoo that was covering up his BMR tattoo.

In his sole issue, appellant contends the trial court reversibly erred by overruling his objection to the following closing argument by the prosecutor:

> Ladies and gentlemen, "greed," for lack of a better word, is good.
>
> Mike Douglas said that in a movie, Wall Street. That's what this case is about.
>
> This case is about Jamaican Marvin slinging dope as an outsider in a neighborhood he didn't really belong in.
>
> And I'll tell you what they did: They warned him three times, robbed him three times, and then they finally killed him.
>
> You know why? Greed. He's taken their money.
>
> That's the whole motivation behind this case. You want a motive that we don't have to give you? There it is. Who's controlling the money in the neighborhood? Certainly not this outsider, certainly not this Jamaican Marvin. Why would BMR let him in there to sell?
>
> [DEFENSE COUNSEL]: Judge, this is outside the record and we object to his argument.

4

The trial court overruled the objection, and the prosecutor moved on to arguing about proving the elements of the case and whether Bernal was a credible witness.

Proper jury argument must fall within one of four general areas: summation of the evidence, reasonable deduction from the evidence, answer to argument of opposing counsel, and pleas for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). A prosecutor may not use closing arguments to present evidence that is outside the record. *Freeman v. State*, 340 S.W.3d 717, 728 (Tex. Crim. App. 2011), *cert. denied*, 132 S. Ct. 1099 (2012). Improper references to facts that are neither in evidence nor inferable from the evidence are generally designed to arouse the passion and prejudice of the jury and, as such, are inappropriate. *Id.*

Here, the evidence showed Moore was a drug dealer, and Detective David agreed with defense counsel's characterization that Moore was a "pretty notorious dope slinger." Although police talked with other suspects "who had nothing to do with BMR," only appellant had a BMR tattoo and was identified by Bernal. Detective Nelson, who worked in the Dallas Police Department's gang unit for fourteen years, was familiar with BMR, which stood for "Blood Money Records." Other evidence showed that Moore had been robbed in the past and that the incident resulting in his death involved a robbery. Before the shooters left, they checked Moore's pockets and also took a weapon that was on the bed. Given this evidence, we cannot conclude the prosecutor made an unreasonable deduction from the evidence when she argued Moore was killed by members of the BMR gang because of money.

But even if the argument was improper, the error is not reversible. Improper argument of this type is nonconstitutional in nature, and a nonconstitutional error "that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b); *Freeman*, 340 S.W.3d at 728.

To determine whether appellant's substantial rights were affected, we balance the severity of the misconduct, that is, the prejudicial effect, any curative measures, and the certainty of conviction absent the misconduct. *Freeman*, 340 S.W.3d at 728.

Initially, we note the trial court admonished the jury before arguments began that "anything that the attorneys say in closing arguments is not evidence. Arguments are meant to reflect what they understand the evidence to be." The complained-of argument here was brief. Its substance went to appellant's motivation, which, as the prosecutor noted, was not an element of the offense or something the State had to prove. Once the trial court overruled the objection, the prosecutor immediately moved on to another subject. Viewing the argument as a whole, we cannot conclude appellant was prejudiced by the prosecutor's comments.

Further, the objection to this particular argument was overruled, so no curative instruction was given. However, the evidence in this case was strong and included eyewitness testimony that appellant was the shooter. This was not the first time Bernal had seen appellant; she recognized appellant from seeing him several times in the neighborhood and at Moore's house. Bernal identified him in a photographic lineup and at trial. Although she did not know appellant's name, she was able to give police a distinguishing feature: the BMR tattoo on his forearm. When appellant was arrested five days after the shooting, he had tried to cover up his tattoo with a fresh tattoo. Given the brevity of the comments, the lack of prejudice, and the strength of the evidence in this case, we cannot conclude the prosecutor's argument regarding appellant's motivation for killing Moore substantially influenced the jury's verdict against appellant. Consequently, appellant's substantial rights were not affected. *See* TEX. R. APP. P. 44.2(b). We overrule appellant's sole issue.

We affirm the trial court's judgment.

/Molly Francis/

MOLLY FRANCIS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
120631F.U05

7



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JZACQUANE HICKMAN, Appellant

No. 05-12-00631-CR　　　V.

THE STATE OF TEXAS, Appellee

On Appeal from the 203rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F10-60332-P.
Opinion delivered by Justice Francis;
Justices FitzGerald and Lewis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered July 29, 2013

/Molly Francis/
MOLLY FRANCIS
JUSTICE