AFFIRM; Opinion Filed October 30, 2012.



In The

## Court of Appeals
## Fifth District of Texas at Dallas

No. 05-11-00604-CR

**JOSE ARREZ RANGEL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 195th Judicial District Court
Dallas County, Texas
Trial Court Cause No. F09-53959-N

# OPINION

Before Justices Bridges, Francis, and Myers
Opinion By Justice Myers

Appellant Jose Arrez Rangel was convicted of murder and sentenced to life imprisonment. In two points of error, he contends the trial court abused its discretion by (1) denying his motion to suppress and (2) overruling his motion for mistrial. We affirm.

## BACKGROUND AND PROCEDURAL HISTORY

Santos Lozano, Sr. (Santos) spent the afternoon and evening of Sunday, April 19, 2009, at a rodeo and then a discotheque called Two-Thousand-One. He was accompanied by the complainant, Antonio Sanchez, his two sons, Daniel Lozano and Antonio Sanchez, Jr. (Junior), and several of the complainant's friends. After they left the nightclub, the group drove in four cars to Morelia's Restaurant, which was located at the corner of Jefferson and Plymouth Streets in Dallas,

Texas. Santos and the complainant rode in the rear seat of a black Hummer driven by Daniel, followed by a Yukon, a BMW, and a Jeep. Junior was riding in the Yukon. When the group arrived at the restaurant, Santos got out of the Hummer to open the gate to the restaurant's parking lot. He heard gunshots. Santos initially believed the complainant was firing his gun in celebration, but he soon discovered that both Daniel and the complainant had been shot. Daniel and Junior returned fire at the shooters, as did Juan Sarli, also known as "Paco," the complainant's bodyguard. Santos reached for his cell phone and called 911.

Santos testified that he saw two men dressed all in black and carrying high-caliber rifles run toward the back of the restaurant. They had been firing at the Hummer from inside the restaurant's parking lot, and Santos suspected one of the shooters had been injured during the gunfight. Daniel, the complainant, and the complainant's bodyguard were shot. The complainant died from multiple gunshot wounds.

Another witness, Brian Keith Fry, lived in an apartment complex that was located behind the restaurant. He testified that he was standing on the balcony of his second floor apartment on April 20, 2009, at approximately 3 a.m., when he heard gunshots. A moment or two after that, Fry saw a "Spanish gentleman come down the fence next to the apartments." The individual's right leg "was injured in some kind of way," and he was limping. He walked along a nearby fence towards an alleyway near "a bunch of limestone rocks." The individual "went down the rocks" and Fry "didn't see where he went after that." Fry added that, shortly before this individual walked down the alleyway, he saw another individual walking in the same direction. Fry recalled that the two individuals were "[p]robably a minute apart." Fry testified that he later walked "down that same area, and on top of one of the big limestone rocks there was a small puddle of blood."

The police arrived at the scene just as the suspects were fleeing. Officer Thaddeus Hasse of

−2−

the Dallas Police Department testified that, at approximately 3:10 a.m. on April 20, 2009, he was on patrol approximately five blocks from the restaurant when he "heard what I knew was a gun battle, and I heard large-caliber rifles, pistols going off." Hasse suspected the gunfire was coming from a club located across the street from the restaurant, because a murder had recently occurred there. When he got to the club, however, he noticed it was closed, so he looked across the street to the restaurant and "could literally see the smoke from the gun battle." Arriving at the crime scene, Hasse saw the complainant's body lying in the street near the Hummer, which was "riddled with bullets." There "was a lot of blood around the complainant's body," as well as numerous fired cartridge casings and bullet fragments. Hasse noticed a "small bag with a white powder substance" lying in the street, which he stated "could have been" cocaine.

Witnesses told Hasse that the suspects had fled to the back of the restaurant. Hasse pursued the suspects and "saw an individual wearing all black with a black hoodie run right in front of these apartments" behind the restaurant. Hasse was very familiar with the area, including a small creek located near the restaurant, and knew that a nearby six foot fence was difficult to climb. When he reached the creek, Hasse saw bloody footprints that were "fresh and glistening."

After waiting for backup, Hasse and another officer followed the footprints to the creek, where they "disappeared into the water." The officers looked underneath the bridge that crossed the creek and saw an individual "half-ways hiding behind a pillar, a big concrete pillar underneath the bridge." He appeared to be "trying to make himself look as small as possible behind this pillar." Both officers pointed their weapons at the individual and ordered him to "show his hands," but he did not comply. Hasse testified that the individual, who Hasse later learned did not speak English, had a "nonchalant look on his face" like it "was another day in the office. Basically, no response." Hasse said the individual "wasn't listening," and they "took him to the ground and effected an

arrest." As the officers escorted him up the creek embankment, Hasse noticed the individual was "bleeding profusely" from his foot, and that he was wearing "black, zip-up, military-style boots." Hasse said they were the type of boots police officers and military personnel wear. Hasse identified appellant in court as the individual they arrested.

Hasse testified that after they took appellant into custody, Hasse followed the trail left by the bloody footprints and found a discarded black "hoodie" on a fence in the area where Hasse first saw appellant. Gloves were found inside the hoodie. Hasse continued to follow the bloody footprint trail and found an abandoned black hat and an assault rifle, and then followed the trail "[a]ll the way back to the offense location." Hasse testified that blood droplets were found near the bloody footprints, and he believed the droplets came from a wound on appellant's head.

After appellant was taken into custody, he was placed in an ambulance and driven to the Methodist Dallas Medical Center. The physician who treated appellant, Dr. Robert Glatz, testified that appellant suffered an "[i]n and out" gunshot wound to his right ankle, a dislocated shoulder, and an injury to his forehead. Because of the "in and out" nature of the gunshot wound, no bullet was recovered. Appellant was treated and discharged from the hospital that same day.

When he was discharged from the hospital, appellant was brought to the police headquarters for questioning. Detective Eduardo Ibarra, a Special Investigations Unit officer who spoke fluent Spanish, interviewed appellant. Ibarra testified that, at the time he spoke to appellant, appellant was not under arrest but had been "detained to further investigate his involvement as to how he got shot and why he was found in the general vicinity of that shooting." Ibarra added that appellant "was detained with the possibility of arrest," but no arrest warrant had been issued "at that time." Ibarra interviewed appellant in Spanish. An English transcription of the interview was admitted at trial.

During the interview, appellant told Ibarra, according to Ibarra's testimony, that he had been

-4-

in the country for three days and had family in Houston and Chicago. Appellant also said he had no family in Dallas. Appellant told Ibarra he was in Dallas to meet with a man named "Juan," who appellant had allegedly known for years, because he knew of a job for appellant at a local restaurant. Appellant was supposed to meet Juan (he did not know this individual's last name) at that restaurant, but appellant was not sure of its name or location. Appellant contended he was wandering around the area during the early morning hours of April 20, 2009, because he was trying to find the restaurant. Appellant denied using a firearm on the day in question or being close to anyone who had fired a gun.

Appellant told Ibarra that, when he was shot, he was looking in some store windows at a shopping center located across the street from the restaurant, near a Blockbuster store. The distance from the restaurant's parking lot gate to the area where appellant claimed to have been standing when he was shot was ninety-seven feet. Appellant told the detective that, after he was shot, he ran north on Plymouth Street and onto Davis Street. Appellant said he did not wait for an ambulance because he did not want the police to think he was involved in the shooting.

Ibarra also questioned appellant about the contents of several small pieces of paper found inside appellant's wallet. One piece of paper contained the name "Ruben" followed by a telephone number with a "972" Dallas area code. Hospital staff had taken the wallet and given it to the police officers that transported appellant from the hospital to police headquarters. Ibarra testified that he received the wallet after it was transferred to him by the officers that transported appellant to police headquarters. The wallet was "within [appellant's] property," according to Ibarra. Ibarra said he examined the contents of the wallet because the police "wanted to make sure that, one, we were dealing with the person who he claimed he was. So that would have been a source to contact to make sure that he is who he said he was and to confirm if that person was supposed to meet the

-5-

defendant."[1] Until Ibarra asked appellant about the name "Ruben" and the Dallas telephone number, appellant maintained he did not know anyone in Dallas. Another witness, Dallas Police Department homicide detective Scott Sayers, noted that the police were still investigating a "person of interest" by the name of "Ruben Galvan," who was in federal custody. Ibarra testified that, following the interview, appellant was charged with murder.

Police found no physical evidence to corroborate appellant's contention as to where he was standing when he was shot, or where he allegedly went after he was shot. Dallas Police detective Richard Dodge testified that there was no physical evidence to corroborate appellant's contention that he was shot as an innocent bystander on the Blockbuster side of the street. Other evidence showed that the bullets were fired from inside the restaurant's parking lot, towards the Hummer. The distance from where the shooting occurred to where appellant claimed he was standing, on the other side of the street, was ninety-seven feet.

Forensic evidence indicated that two assault-style rifles had been used in the shooting. Police recovered from the crime scene .9 millimeter cartridge casings, .45 caliber cartridge casings, .38 caliber cartridge casings, and thirteen 7.62-X-39 millimeter cartridge casings. According to Lanny Emanuel, a firearms and toolmark examiner with the Southwestern Institute of Forensic Sciences (SWIFS), the assault rifle that was found by the police had fired five of the recovered 7.62 millimeter shell casings. A similar type of weapon fired the other eight shells. The two shell casings recovered from the complainant during the autopsy were "consistent with a 7.62 rifle," which is an AK-47-style weapon. One of the shells was fired by the weapon recovered by the police; the other was fired by

_____

[1] The record is unclear as to precisely how much time elapsed between the capture of appellant and the search of his wallet. Appellant's medical records from the Methodist Hospital show he was examined at 4:18 a.m. on April 20, 2009, and discharged at 7:42 a.m. that day. The video recording of appellant's interrogation (which was transcribed for the jury) started at 8:27 a.m. on the morning of April 20, according to Ibarra's testimony. Ibarra recalled that he entered the interrogation room at 10:08 a.m.

a similar type of weapon. Vicki Hall, a trace evidence examiner with SWIFS, testified that most handguns would expel gunshot particles "out to about 5 to 7 feet," and that rifles or shotguns would expel particles "a little bit further," but no more than ten feet. Ibarra testified that, based on appellant's version of events, there was "no way" he could have had gunshot residue on him if he was standing so far away from the crime scene.

The hat, hoodie, and gloves found at the crime scene tested positive for blood and gunshot residue. Courtney Ferreira, a DNA analyst with SWIFS, testified that DNA testing showed the blood matched appellant. Hall testified that gunshot residue was found on appellant as well as on the hat, hoodie, and gloves. According to Hall's written report, the presence of such gunshot particles on an individual's clothing could have been due to either (1) firing a firearm, (2) handling a firearm or firearm component that had been fired, (3) being in the proximity of a firearm when it was fired, or (4) wiping a firearm or firearm component on the garment.

## DISCUSSION

### *Appellant's Wallet*

In his first point of error, appellant argues the trial court erred when it denied his motion to suppress the contents of the wallet because the search was illegal and violated the Fourth Amendment. The State responds that the search was lawful incident to appellant's arrest.

According to the record, the defense objected to admission of a photocopy of the several small pieces of paper that were found in appellant's wallet. Defense counsel argued that the exhibit was the "product of an illegal search and seizure, and at that time no arrest having been made." The trial court overruled the defense's objection and admitted the document.

In reviewing a trial court's ruling on a motion to suppress evidence, we apply a bifurcated standard of review. *Carmouche v. State,* 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We give

almost total deference to the trial court's determinations on all fact questions and on application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Johnson v. State*, 68 S.W.3d 644, 652 (Tex. Crim. App. 2002). On all other application-of-law-to-fact questions, we apply a de novo standard of review. *Id.* at 652-53. We view the record and all reasonable inferences from the record in the light most favorable to the trial court's ruling and sustain the ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). The trial court's ruling will be upheld if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

A search incident to arrest is an exception to the Fourth Amendment's warrant requirement. *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003). The police may search a suspect's personal effects, including a wallet, as part of a search incident to an arrest. *See Dew v. State*, 214 S.W.3d 459, 462 (Tex. App.—Eastland 2005, no pet.) (citing *Snyder v. State*, 629 S.W.2d 930, 934 (Tex. Crim. App. 1982)). For a search to be considered "incident to arrest," it must take place contemporaneously with the defendant's custodial arrest. *United States v. Robinson*, 414 U.S. 218, 225-27 (1973); *Williams v. State*, 726 S.W.2d 99, 101 (Tex. Crim. App. 1986); *Giles v. State*, No. 01-08-00410-CR, 2010 WL 2133893, at *9 (Tex. App.—Houston [1st Dist.] May 27, 2010, pet. ref'd) (not designated for publication).

In this case, however, we need not address the State's argument that the search was lawful incident to appellant's arrest because, even if we assume the trial court erred, the error, if any, was harmless. We review the harm resulting from a trial court's erroneous denial of a motion to suppress and subsequent admission of evidence obtained in violation of the Fourth Amendment under the harmless error standard found in rule 44.2(a). *See* TEX. R. APP. P. 44.2(a); *Hernandez v. State*, 60

S.W.3d 106, 108 (Tex. Crim. App. 2001); *Long v. State*, 203 S.W.3d 352, 353 (Tex. Crim. App. 2006). "If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a). "If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error is not harmless beyond a reasonable doubt." *McCarthy v. State*, 65 S.W.3d 47, 55 (Tex. Crim. App. 2001); *see also Langham v. State*, 331 S.W.3d 87, 89 (Tex. App.—Eastland 2010, pet. ref'd). "[T]he appellate court should calculate as much as possible the probable impact of the error on the jury in light of the existence of other evidence." *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). One determination that must be made is whether "there was a reasonable possibility that the error, either alone or in context, moved the jury from a state of nonpersuasion to one of persuasion as to the issue in question." *Id.*

The jury's verdict in this case is supported by overwhelming evidence. A witness saw an Hispanic individual with an injured right leg limp away from the crime scene shortly after the shooting. After talking to witnesses, Hasse found a trail of bloody footprints that he followed to the area where appellant was hiding, underneath a bridge near the crime scene. Appellant had a gunshot wound to his right ankle. Hasse followed the bloody footprint trail back to the scene of the shooting, and discovered a black hoodie, gloves, hat, and an assault rifle discarded along the trail. Appellant's DNA was found on the hoodie, hat, and gloves, as was gunshot residue. Gunshot residue was also found on appellant. Testimony showed that appellant could not have been standing across the street from the restaurant at the time of the shooting, as he told the police. No physical evidence was found on that side of the street to corroborate appellant's assertions, and testimony also showed that gunshot residue could not have ended up on appellant at that distance, which was ninety-seven feet

–9–

from the crime scene. Other testimony showed that gunshot residue could have traveled, at most, ten feet—even with the use of a rifle or shotgun. The only evidence provided by the slips of paper found in appellant's wallet was that he knew someone named "Ruben" who had a "972" Dallas telephone number. This evidence may have aided the police in challenging appellant's story and determining the identity of another suspect in the case. We conclude, however, that there is no reasonable possibility the disputed evidence "moved the jury from a state of nonpersuasion to persuasion as to the issue" of appellant's guilt. *See Wesbrook*, 29 S.W.3d at 119. Accordingly, the error, if any, was harmless. We overrule appellant's first point.

### *Motion for Mistrial*

In his second point of error, appellant contends the trial court abused its discretion by failing to declare a mistrial following allegedly improper punishment argument. The relevant portion of the record reads as follows:

> [PROSECUTOR]: Mr. Rangel was in this state for three days, and [defense counsel] tells you that he doesn't even want to be here. Well, I want to make sure that everyone understands, he was not invited to this place. He came into this place in the dead of the night to do a job. It wasn't by our invitation. We don't want him here either. He came here to kill Antonio Sanchez.
> Now, it couldn't be any clearer, unless you had a neon blinking sign over that Hummer that says "cartel hit."

> [DEFENSE COUNSEL]: Judge, objection. Cartel is outside the evidence in the record. We object to that.

> THE COURT: Sustained.

> [DEFENSE COUNSEL]: We ask the jury to disregard that.

> THE COURT: The jury will recall the evidence as they heard it.

> [DEFENSE COUNSEL]: Move for a mistrial, Judge.

> THE COURT: Overruled.

Appellant argues the trial court abused its discretion because the prosecutor's "cartel hit" statement was not based on the evidence presented, was inflammatory, and was "manifestly unfair."

We review a trial court's ruling on a motion for mistrial for an abuse of discretion and uphold the court's ruling if it was within the zone of reasonable disagreement. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). A mistrial is appropriate only for highly prejudicial and incurable errors. *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003). "A mistrial is the trial court's remedy for improper conduct that is 'so prejudicial that expenditure of further time and expense would be wasteful and futile.'" *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (quoting *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)). "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Hawkins*, 135 S.W.3d at 77. In most instances, an instruction to disregard will cure the error even when the prosecutor argues facts outside the record or interjects his personal opinion. *See Wesbrook*, 29 S.W.3d at 115-16; *Martinez v. State*, 17 S.W.3d 677, 691 (Tex. Crim. App. 2000); *Guidry v. State*, 9 S.W.3d 133, 154 (Tex. Crim. App. 1999); *Wilkerson v. State*, 881 S.W.2d 321, 327 (Tex. Crim. App. 1994).

Proper jury argument generally falls within one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to an argument of opposing counsel; and (4) plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). "Improper references to facts that are neither in evidence nor inferable from the evidence are generally designed to arouse the passion and prejudice of the jury and, as such, are inappropriate." *Freeman v. State*, 340 S.W.3d 717, 728 (Tex. Crim. App. 2011). When facts not supported by the record are interjected into an argument, "such error is not reversible unless, in light of the record, the argument is extreme or manifestly improper." *Guidry*, 9 S.W.3d at 154. "The remarks must have been a willful and calculated effort on the part of the State to deprive appellant of a fair and impartial trial."

*Wesbrook*, 29 S.W.3d at 115. To determine whether there has been an improper jury argument, we consider the context in which the remark was made. *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988).

When determining whether improper jury argument warrants a mistrial, we balance three factors: (1) the severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of the punishment assessed absent the misconduct (likelihood of the same punishment being assessed). *Hawkins*, 135 S.W.3d at 77 (citing *Martinez*, 17 S.W.3d at 693-94); *see also Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

Beginning with the question of whether the State's jury argument was proper, appellant points out that, other than "conjecture and unsupported opinions," there was no evidence he was in a cartel "or even what a cartel is." But counsel is allowed wide latitude in drawing inferences from the evidence that are reasonable, fair, legitimate, and offered in good faith. *See Shannon v. State*, 942 S.W.2d 591, 597 (Tex. Crim. App. 1996); *Gaddis*, 753 S.W.2d at 398. The prosecutor's remark was consistent with the acknowledgment in his opening statement that the complainant was not a "pillar of the community," that he "was involved in the drug trade," and he had "connections with the cartel." The evidence showed that the shooters laid in wait for the multi-car caravan and were armed with high-caliber military-style assault rifles. Several of the caravan's occupants, including the complainant's bodyguard, also carried weapons, and exchanged gunfire with the shooters. When he first arrived at the crime scene, Hasse noticed a "small bag with a white powdery substance" lying in the street, which he stated "could have been" cocaine. During the closing arguments at the end of the guilt-innocence phase, defense counsel described the shooting as a "Mexican shootout" and a "drug deal gone awry." Although there was no direct evidence the shooting was a "cartel hit," we conclude the prosecutor's remark was a reasonable deduction from the evidence. The trial court

–12–

need not have sustained appellant's objection, and appellant was not entitled to the instruction about which he now complains.

Yet, even if we were to assume for the sake of argument that the prosecutor's comment was improper, the trial court did not abuse its discretion by overruling the motion for mistrial. Applying the relevant factors, the first question is not whether the prosecutor's statement had prejudicial consequences, but the extent to which it did, that is, the "severity" or "magnitude" of the prejudice it likely caused. *See Archie v. State*, 340 S.W.3d 734, 741 (Tex. Crim. App. 2011). The complained-of comment was only a small part of the prosecutor's closing argument. After the court sustained appellant's objection, the court promptly instructed the jury, and the prosecutor did not repeat the comment. The prosecutor's comment cannot be seen as having such a prejudicial effect that it caused appellant incurable harm.

As for curative measures taken by the trial court, appellant argues the court's instruction to the jury was not curative. We see nothing in the record, however, to suggest the court's instruction was insufficient to cure any harm caused by the prosecutor's comment, or that the jury failed to follow the instruction. *See Jackson v. State*, 50 S.W.3d 579, 590 (Tex. App.—Fort Worth 2001, pet. ref'd) (court's instruction to "recall the evidence" was instruction to disregard that cured improper jury argument); *see also Long v. State*, 823 S.W.2d 259, 267 (Tex. Crim. App. 1991) (although court overruled objection, instruction that jurors "recall the evidence as you heard it . . . what the lawyers say is not evidence" was sufficient to cure any error from prosecutor's comment).

Turning to the third factor, whether the punishment would have been the same absent the improper argument, the jury's verdict is supported by overwhelming evidence. As noted earlier, the evidence showed that the shooters laid in wait for the caravan and were armed with military-style assault weapons. DNA and gunshot power residue, as well as a bloody footprint trail near the crime

scene, linked appellant to the offense. The complainant died from multiple gunshot wounds. Given the evidence and the nature of the offense, we cannot conclude the prosecutor's remark contributed to the punishment assessed. Under the facts of this case, we cannot say the trial court abused its discretion by denying the motion for mistrial. We resolve appellant's second point against him.

We affirm the trial court's judgment.

_____
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
110604F.U05



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

JOSE ARREZ RANGEL, Appellant

No. 05-11-00604-CR          V.

THE STATE OF TEXAS, Appellee

Appeal from the 195th Judicial District
Court of Dallas County, Texas. (Tr.Ct.No.
F09-53959-N).
Opinion delivered by Justice Myers, Justices
Bridges and Francis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered October 30, 2012.


_____
LANA MYERS
JUSTICE