

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-77,076

**BILLY JOEL TRACY, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. 15F0677-102
### IN THE 102ND JUDICIAL DISTRICT COURT
### BOWIE COUNTY

KELLER, P.J., delivered the opinion of the Court in which KEASLER, HERVEY, RICHARDSON, YEARY, NEWELL, KEEL and SLAUGHTER, JJ., joined. WALKER, J. concurred.

In 2015, while he was incarcerated in a penal institution, Appellant killed Correctional Officer Timothy Davison. For this, a jury convicted Appellant of capital murder.[1] In accord with the jury's answers to the special issues, the trial court sentenced him to death.[2] In his direct appeal

---

[1] *See* TEX. PENAL CODE § 19.03(a)(5)(A).

[2] *See* TEX. CODE CRIM. PROC. art. 37.071 § 2(b), (e), and (g). Unless otherwise indicated, all future references to Articles refer to the Texas Code of Criminal Procedure.

to this Court,[3] Appellant raises fourteen points of error. After reviewing them, we find them to be without merit. Consequently, we shall affirm the judgment of the trial court.

## STATEMENT OF FACTS

### A. Background

Appellant began his life of crime at age seventeen. His arrest for a number of offenses led to a three year prison sentence for retaliation in 1995. Over the next twenty years, most of which he spent in prison, his offenses became more brutal.

One night in 1998, Appellant entered the home of an acquaintance, Kasey Kuhn, through an open window and demanded that she have sex with him. Biting and hitting him, Kuhn refused. Appellant covered her face with a pillow and choked her until he thought she was dead. Once she lost consciousness, Appellant dropped her out of her window, put her in his car, and began driving around. When Kuhn regained consciousness, Appellant pulled the car over and beat her until she lost consciousness again. He then pulled her out of the car and dragged her into the woods.

Police Officer Paul Britt noticed Appellant's car on the side of the road, found the situation suspicious, and investigated. As he got out of his car, Officer Britt heard "help me help me." He saw Appellant on the ground by the car with blood on his hands and believed that he was drunk. Officer Britt pulled his weapon and approached Appellant. Appellant ran away and, while evading arrest, broke into and hid in a number of homes. He took cash and jewelry from some of the homes.

After Appellant ran off, Officer Britt noticed Kuhn, who was covered in blood and appeared to have had her throat slit. Kuhn was transported to the hospital where she was treated for injuries

---

[3] TEX. CODE CRIM. PROC. art. 37.071 § 2(h).

that included a broken orbital bone, broken nose, and lost teeth. She underwent surgery to have a plate put in the left side of her face to hold the bones together. Kuhn, sixteen at the time of the assault, suffered debilitating migraines and permanent injury to her vision.

While awaiting trial on these charges, Appellant was involved in a number of incidents at the Rockwall County Jail. He threw feces and urine at corrections officers, threatened inmates and officers, attacked other inmates, and was found in possession of contraband. He was considered by one law enforcement officer to be "the most difficult inmate he ever had to deal with." Appellant also attempted to escape from the jail. He slipped his handcuffs off, took an officer's gun, pointed it at officers, and fired two shots that, fortunately, missed the officers.

Appellant was convicted of aggravated assault, assault on a public servant, and several counts of burglary of a habitation. He was sentenced to life in prison and sent to the Allred Unit of the Texas Department of Corrections.

While at the Allred Unit, Appellant committed twenty-seven assaults on staff members, threatened to kill correctional officers, threw darts at guards from his cell, and was caught in possession of contraband so often that his cell was searched every four hours. His behavior was so erratic and non-compliant that pepper spray and other chemical agents were used numerous times to subdue him. Appellant converted a welding rod into a shank and stabbed a guard in the shoulder, which resulted in his transfer to the Clements Unit.

There, in 2005, Appellant attacked Officer Katie Stanley with a piece of metal that had been fashioned into a shank. He stabbed Stanley seven times, kicked her in the head, and lifted her up in an unsuccessful attempt to throw her over the railing of the third floor. A video of this assault was

created to show to new correctional officers during training. Appellant pleaded guilty to aggravated assault with a deadly weapon on a public servant, aggravated assault causing serious bodily injury on a public servant, and possession of a deadly weapon in a penal institution. He received a forty-five year sentence and was transferred to the Robertson Unit.

Appellant's behavioral issues continued. He was frequently found in possession of contraband such as needles, homemade screwdrivers, protractors, sandpaper, razor blades, and sharpened pieces of metal. He also tampered with a lock and threatened corrections officers. In 2009, Appellant attacked Officer Brian Lomas with a weapon fashioned from razor blades. Appellant slashed the razor blades across Lomas's face, resulting in injuries that required over 200 stitches. Appellant received a ten year sentence for assault on a public servant and was transferred to the Hughes Unit.

At the Hughes Unit, Appellant was found in possession of contraband. He defeated the facility's x-ray machine, the purpose of which is to detect material coming into the prison, by hiding contraband between two legal mail folders and using tape to deflect detection. In 2014, officers noticed Appellant and two other inmates spending a significant amount of time together and speaking in Spanish. An interpreter determined that they were discussing a plan to escape. Officers separated them and searched their cells; they found sandpaper, saw blades, a homemade dremel tool, and other contraband in Appellant's cell. Officers discovered that the inmates had used the tools to cut through metal bars in the recreation area to facilitate the escape, and then painted over the cuts to conceal them. After this escape attempt, Appellant was transferred to the Telford Unit.

**B. Instant Offense**

On July 15, 2015, Timothy Davison was employed at the Telford Unit as a correctional officer. He worked in the section of administrative segregation housing to which Appellant was assigned. Davison's murder, as well as the events leading up to and after the murder, were captured on prison surveillance cameras.

Appellant was escorted by a correctional officer to recreation, where he spent his time stretching in preparation for his assault on Officer Davison. Appellant was then escorted back to his cell by Officer Davison. Davison was equipped with chemical pepper spray and a metal slot bar used by guards to open cell doors and food tray slots. The slot bar was a solid metal bar with a pipe-like handle and a flat piece of metal at the end. As Appellant was escorted back to his cell, he manipulated his hand restraints and placed them both on his right wrist. When Officer Davison opened Appellant's cell door, Appellant struck him with his fists until Davison was knocked to the floor. During this attack, Officer Davison's metal slot bar fell to the ground. Appellant picked it up, straddled Davison, and struck him in the head and face with it until he became incapacitated. Appellant continued to strike Davison with the metal bar after he lost consciousness.

Appellant then removed the chemical pepper spray from Officer Davison's belt, grabbed him by his legs, and threw him down the staircase. Appellant threw the slot bar down the stairs and sprayed the pepper spray towards Officer Davison before walking back to his cell and closing the door behind him. DNA analysis of evidence collected at the scene, including the slot bar and one of Appellant's shoes, resulted in a finding of a mixture profile that was 3.24 sextillion times more likely to be DNA from Officer Davison and Appellant than two unrelated, unknown individuals.

Officer Davison was transported via helicopter to a local hospital. Shortly after his arrival, he was pronounced dead.

The State's case at trial relied primarily on the testimony of guards who either witnessed the incident or responded to provide help afterwards. After the offense, an extraction team was formed to remove Appellant from his cell, conduct a strip search, place him in hand restraints, and, if necessary, use chemicals to force compliance. After initial resistance, Appellant complied with the extraction team's orders and was placed in a separate holding cell.

In the holding cell, Appellant made numerous comments to corrections officers about how the prison staff were "stupid" for not having a lieutenant guard his cell and that this is "just what [he] does." He told one guard "yeah I beat [Officer Davison's] ass why do you care it's not like y'all are friends," and said that "maybe next time" it would be another guard. Appellant claimed that he could hurt anyone in prison any time he wanted. Officers at trial described Appellant as extremely violent, unpredictable, manipulative, problematic, and resistant to authority.

After finding Appellant guilty of capital murder, the jury deliberated for one hour before returning with a verdict answering "yes" to special issue number one and "no" to special issue number two. The judge sentenced Appellant to death.

## HYBRID REPRESENTATION

In his first point of error, Appellant claims the trial court committed structural error by denying his request for hybrid representation in violation of the Texas Constitution. Appellant filed numerous pro se pretrial motions. At a pretrial hearing, the trial court said that Appellant was not entitled to hybrid representation and refused to rule on any of the pro se motions that appointed

counsel had not reviewed.

Appellant relies on the Texas Constitution, which grants an accused "the right of being heard by himself or counsel, or both."[4] In his brief, he acknowledges that precedent would indicate that the trial court's ruling was correct. He claims, however, that his case is distinguishable from precedent because it involves pretrial motions rather than trial proceedings. Appellant claims that in prior cases, hybrid representation was disallowed because of the possibility of chaos and confusion in front of the jury, and pretrial motions do not pose that threat. He also claims that the trial court's ruling was in error because "death is different."

While it is true that hybrid representation can cause chaos and confusion, that is not the reason that it is disallowed in Texas. In the opinion on rehearing in *Landers v. State*,[5] this Court explained the historical underpinnings of the Texas constitutional provision at issue. In short, the constitutional right of a defendant to be heard by himself was instituted to assure that defendants have the right to testify.[6] And the right to be heard by counsel was intended to do away with the rules that denied representation, in whole or in part, by counsel in criminal prosecutions.[7] Article 1, Section 10 was not intended to encompass the right to self-representation as delineated in *Faretta v. California*.[8] For the same reason, Appellant's argument that death penalty cases require hybrid

---

[4] TEX. CONST. ART I, § 10.

[5] 550 S.W.2d 272, 274 (Tex. Crim. App. 1977).

[6] *Id*. at 277.

[7] *Id*. (quoting *Betts v. Brady*, 316 U.S. 465 (1942)).

[8] 422 U.S. 806 (1975).

representation also lacks merit. The trial court did not err in disregarding the pretrial pro se motions presented by Appellant.[9] His first point of error is overruled.

## MOTION TO CHANGE VENUE

In his second issue, Appellant argues the trial court erred in denying his motion to change venue. Appellant contends there was excessive and prejudicial pretrial publicity in Bowie County, and that the Telford Unit, where Officer Davison was employed, is an important economic entity in Bowie County, creating a likelihood that a fair and impartial trial would be impossible.

A change of venue may be granted if the defendant establishes that "there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial."[10] Where a defendant seeks a change of venue based on media attention, he must show that the publicity was "pervasive, prejudicial, and inflammatory."[11] Widespread publicity by itself is not considered inherently prejudicial.[12] A defendant must demonstrate "an actual, identifiable prejudice attributable to pretrial publicity on the part of the community from which members of the jury will come."[13]

We review the trial court's ruling on a motion for change of venue for an abuse of

---

[9] *See Robinson v. State*, 240 S.W.3d 919, 922 (Tex. Crim. App. 2007).

[10] TEX. CODE CRIM. PROC. art. 31.03.

[11] *Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007).

[12] *Renteria v. State*, 206 S.W.3d 689, 709 (Tex. Crim. App. 2006).

[13] *DeBlanc v. State*, 799 S.W.2d 701, 704 (Tex. Crim. App. 1990) (internal quotation marks omitted).

discretion.[14] The trial court's decision to deny a motion to change venue will be upheld as long as it falls within the zone of reasonable disagreement.[15] The two primary means of discerning whether publicity is pervasive are a hearing on the motion to change venue and the testimony of veniremembers at voir dire.[16]

Appellant filed a motion to change venue accompanied by two affidavits. The State responded to the motion and attached affidavits to its response. At a hearing on the motion, Appellant called Brent McQueen, a fact investigator for the defense. McQueen testified to media coverage of the case by print and digital newspapers and social media platforms. He testified to the presence of online comments made by correctional facility employees and other residents of Bowie County on the various social media and blog posts referring to or sharing the articles covering the case. On cross-examination by the State, McQueen acknowledged that he could not estimate the number of people who had seen or read the articles about which he testified or the number of residents of Bowie County who receive the newspapers. McQueen acknowledged that the facts reported in the articles accurately depicted the incident between Appellant and Officer Davison.

The State called Bowie County Judge James Carlow to testify. Judge Carlow testified that there are nearly 100,000 residents in Bowie County and none had contacted him about Appellant's case. Judge Carlow testified that he believed Appellant could receive a fair and impartial trial in Bowie County, that there was not excessive prejudicial opinion among the citizens of Bowie County

---

[14] *Freeman v. State*, 340 S.W.3d 717, 724 (Tex. Crim. App. 2011).

[15] *Id*.

[16] *Gonzalez*, 222 S.W.3d at 449.

towards the Appellant, and that the news coverage was not prejudicial or inflammatory.

The State also called Bowie County Precinct Two Commissioner, Tom Whitten. Commissioner Whitten testified that he was the elected official to speak on behalf of and represent the people of precinct two. He said that he had been asked no questions concerning Appellant or the case. Commissioner Whitten agreed with Judge Carlow that the articles did not constitute prejudicial or inflammatory publicity that would prevent Appellant from receiving a fair trial in Bowie County.

Testimony at the hearing supports the conclusion that the media coverage was not extensive, inflammatory, or prejudicial. Although there were a number of print and digital newspaper articles and social media posts relating to the case, there was no estimate of how many people in Bowie County actually received or read those articles. A large part of the testimony related to comments made on the articles online, shares on personal Facebook pages, and other reactions on social media pages such as "likes" in response to the articles being posted online. But testimony also showed that many of the people commenting, posting, and responding to the articles were not even Bowie County residents, and would not be in the jury pool.

Furthermore, news stories that are accurate and objective in their coverage are generally considered by this Court not to be prejudicial or inflammatory.[17] Appellant complains of articles that accurately depict the incident in which Officer Davison was killed. They are not, viewed as a whole, inflammatory and prejudicial.

The media coverage was not pervasive, prejudicial, or extensive, and it did not permeate the

---

[17] *Gonzales*, 222 S.W.3d at 451; *Bell v. State*, 938 S.W.2d 35, 46 (Tex. Crim. App. 1996).

Bowie County community to such an extent that a fair and impartial trial would be impossible. The trial judge acted within the zone of reasonable disagreement in denying the motion to change venue based on the presence of media coverage.

Appellant argues that, not only was there extensive, prejudicial media coverage of the case, but also the Telford Unit is an integral part of the Bowie County economy and consequently "the murder of a guard is a vast interest of concern to the population of the county." At the hearing, it was noted that there are approximately 100,000 residents of Bowie County and the Telford Unit has approximately 700 employees. The number of employees at the Telford Unit represents less than one percent of Bowie County's residents. It was further shown that a large part of the jury pool for Bowie County live in the Texarkana area, so those summoned would not necessarily live near the prison.

The record supports the trial court's finding that Appellant could receive a fair trial in Bowie County. We hold that the trial court was within its discretion in denying Appellant's motion to change venue. His second point of error is overruled.

**DEATH PENALTY ISSUES**

Appellant's third through seventh points of error are constitutional challenges to the Texas death penalty scheme. In his third point of error, Appellant asserts that the "10-12 Rule" in Article 37.071 of the Texas Code of Criminal Procedure violates the Eighth and Fourteenth Amendments of the United States Constitution by creating a risk of arbitrary imposition of the death penalty, failing to provide clear instructions to the jury when they reach an impasse in answering the special

issues, and preventing attorneys from effectively conducting voir dire related to jury deadlocks.[18] In his fourth point of error, Appellant argues that the trial court erred by failing to preclude the death penalty as a sentencing option and hold Article 37.071 unconstitutional under *Ring v. Arizona*.[19] Specifically, Appellant argues that his indictment is defective because it did not allege that he would be a future danger or that there were not sufficient facts and circumstances to militate that a life sentence be imposed rather than a death sentence.  In his fifth point of error, Appellant argues the trial court erred in denying his motion to hold article 37.071 sections 2(e) and (f) unconstitutional because they fail to require the jury to consider mitigation in answering the special issue questions. In his sixth point of error, Appellant argues the Texas death penalty statute is unconstitutional because of the jury's inability to predict future dangerousness.  In his seventh point of error, Appellant argues that the definition of "mitigating evidence" in Article 37.071 is unconstitutional as applied because it imposes a "nexus limitation" in violation of the Eighth and Fourteenth Amendments of the United States Constitution.  We have previously rejected all of these claims, and Appellant raises nothing new to persuade us to reconsider them.[20]  Appellant's points of error three through seven are overruled.

---

[18] TEX. CODE CRIM. PROC. art. 37.071.

[19] 536 U.S. 584 (2002).

[20] *See Coble v. State*, 330 S.W.3d 253, 295-98 (Tex. Crim. App. 2010); *Williams v. State*, 301 S.W.3d 675, 694 (2009); *Busby v. State*, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008); *Sells v. State*, 121 S.W.3d 748, 767-68 (Tex. Crim. App. 2003); *Moore v. State*, 969 S.W.2d 4, 13 (Tex. Crim. App. 1998); *Raby v. State*, 970 S.W.2d 1, 6-9 (Tex. Crim. App. 1998); *Cantu v. State*, 939 S.W.2d 627, 648-49 (Tex. Crim. App. 1997); *Shannon v. State*, 942 S.W.2d 591, 599-601 (Tex. Crim. App. 1996).

**JURY ISSUES**

In points of error eight through fourteen, Appellant argues the trial court erroneously denied his challenges for cause to veniremembers Rose, Daniel, Shippey, McDonald, Montanelli, Cross, and Brock. He says that when a member of the venire in a death penalty case would automatically answer one or more of the special issues in the affirmative, he is challengeable for cause. He contends that these veniremembers were challengeable for cause for that reason, and even if they vacillated in their answers to some degree, the record taken as a whole reflects that they would automatically answer the special issues in a way that would result in a sentence of death.

Appellant used his fifteen statutorily-allotted peremptory challenges. He requested three more peremptory challenges, two of which were granted. Appellant's request for an eighteenth peremptory strike was denied and, as a result, an allegedly objectionable juror was seated as the twelfth juror.

Appellant challenged each of the complained-of veniremembers for cause at the conclusion of each individual voir dire. The trial judge denied these challenges for cause. Appellant used a peremptory challenge on all of the complained-of veniremembers. He argues that the trial judge erred in denying his challenges for cause against these seven veniremembers.

A veniremember is challengeable for cause if (among other reasons) he has a bias in favor of or against the defendant or a bias or prejudice against any of the laws applicable to the case upon which the state or defense is to rely.[21] The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and follow instructions in accordance with

---

[21] TEX. CODE CRIM. PROC. art. 35.16(a)(9), (b)(3), & (c)(2); *Feldman v. State*, 71 S.W.3d 738, 744-45 (Tex. Crim. App. 2002).

the law.[22] Before a prospective juror can be excused for cause on this basis, the law must be explained to him and he must be asked whether he can follow that law regardless of his personal views.[23] The proponent of a challenge for cause has the burden of establishing that the challenge is proper, and he does not meet this burden until he has shown that the veniremember understood the requirements of the law and could not overcome his prejudice well enough to follow the law.[24]

We review a trial court's ruling on a challenge for cause with considerable deference because the trial judge is in the best position to evaluate a veniremember's demeanor and responses.[25] When a veniremember's answers in voir dire are ambiguous, vacillating, unclear, or contradictory, particular deference is given to the trial court's decision.[26] We look at the entire record to determine whether there is sufficient evidence to support the trial court's ruling.[27] A trial judge's ruling on a challenge for cause may be reversed only for a clear abuse of discretion.[28]

When a trial judge errs in overruling a challenge for cause against a veniremember, the defendant is harmed if he uses a peremptory strike to remove the veniremember and thereafter

---

[22] *Feldman*, 71 S.W.3d at 744.

[23] *Id*.

[24] *Id*. at 747; *Gardner v. State*, 306 S.W.3d 274, 295-97 (Tex. Crim. App. 2009).

[25] *Gardner*, 306 S.W.3d at 296.

[26] *Id*.

[27] *Feldman*, 71 S.W.3d at 744.

[28] *Gardner*, 306 S.W.3d at 296.

suffers a detriment from the loss of the strike.[29] An appellant must show that the trial court erroneously denied a number of defense challenges for cause equal to at least one more than the additional peremptory challenges in order to show that he was wrongfully deprived of the use of at least one of his allotted peremptory challenges.[30] Because Appellant was granted two extra peremptory challenges in addition to the fifteen allotted by statute, he must establish that the trial court erred in denying at least three of his challenges for cause to demonstrate harm.[31]

### A. Veniremember Rose

Regarding someone who has been convicted of capital murder, Appellant points to Rose's statement that, "I don't believe the State should feed them, take care of them," and that a murderer ought to be executed. Rose also said he favored the death penalty over a life sentence, but he wasn't positive that he could not agree with a life sentence. He also agreed that the death penalty would be the only appropriate punishment if he thought it was the best thing for the general public.

But during the State's voir dire, Rose said that he could take mitigating evidence into consideration in addressing the special issues. He agreed that he could wait until all the evidence was introduced at each phase of the trial before deciding whether the defendant was guilty, whether he was a future danger, or whether a sentence of life without parole or death should be imposed. Rose said: "Depending on the evidence, I could do life. I could do death. It depends on the evidence."

---

[29] *Feldman*, 71 S.W.3d at 744.

[30] *Escamilla v. State*, 143 S.W.3d 814, 821 (Tex. Crim. App. 2004).

[31] *Id*.

DEFENSE: . . . Would you think always that the death sentence would be appropriate, or could you consider that a life [sentence] might be appropriate?

ROSE: I'd go back to the mitigating evidence. . . if you had certain mitigating evidence, I might say life without parole . . .

DEFENSE: You lean toward death?

ROSE: Yes.

DEFENSE: But you are open to life?

ROSE: I am open, yes.

DEFENSE: Considering what the mitigating circumstances might be?

ROSE: Yes.

The State again addressed the issue, asking Rose whether he would wait to be instructed on the law and listen to the evidence before he rendered a verdict or answered the special issues. Rose again said yes, he would be open-minded to the possibility of mitigating evidence and would have to be convinced that the defendant was deserving of a death sentence rather than a life sentence.

Rose repeatedly said that he was open to considering mitigating evidence during the punishment phase of the trial, and that if the circumstances warranted a life without parole sentence, he would impose one. The trial judge did not abuse his discretion in denying Appellant's challenge for cause. Point of error number eight is overruled.

### B. Veniremember Daniel

In answer to various questions on the juror questionnaire, Daniel indicated that she was pro-death penalty, she believed the death penalty is used too seldom in Texas, and she believed in the Biblical idea of "an eye for an eye," whereby a murderer who takes an innocent life should therefore forfeit his own. In various other statements, Daniel discussed her opposition to financially

supporting defendants in prison who make excuses for killing somebody.

During individual voir dire, the State and the defense explained the law to Daniel, and she repeatedly asserted that she could follow the law. Though her answers to the juror questionnaire demonstrated a pro-death penalty attitude, once the law was explained to her, she agreed she would follow the law. After numerous pointed questions from both the State and the defense regarding her ability to follow the law, the following exchange occurred:

> DANIEL: I am not going to make a definite decision on anything. I do not know this gentleman. I do not know the circumstances around this case, and I would not automatically say give him the death penalty without hearing the facts. I would not do that . . .
>
> DEFENSE: . . . can you still consider the mitigat[ing evidence]?
>
> DANIEL: Yes.

The trial judge said that though Daniel initially vacillated in her answers regarding special issue number two, after the law was explained to her, her answers were as a prospective juror's should be. The trial judge did not abuse his discretion in denying Appellant's challenge for cause against veniremember Daniel. Point of error number nine is overruled.

### C. Veniremember Shippey

Shippey's answers to the juror questionnaire indicated a strongly favorable attitude toward the death penalty. He stated on his questionnaire that he would vote in favor of giving the death penalty in a case where the law allowed him to do so, and, when asked whether in some cases a life sentence rather than death would be appropriate, he answered no.

But after the law was explained to him, he repeatedly asserted that he would be able to set aside his personal views and follow the law and the instructions of the judge. Defense counsel

brought up Shippey's answers to the juror questionnaire during his individual voir dire, and Shippey said that his answers to the questionnaire would have been different if he answered the questions after the explanation of the law during voir dire. Specifically, Shippey said: "I'm obviously pro-death penalty, or in favor of the death penalty as being an option . . . but to give that death penalty, then, yes, I would want to weigh the options of what . . . the specifics of the case are."

The trial judge also clarified the differences between Shippey's answers to the juror questionnaire and to questions in voir dire in the following exchange at the conclusion of the State's and defense's voir dire:

> COURT: You pretty well told me you can sit and listen to the evidence. You can listen to the evidence to find whether he's guilty or not guilty of the offense. You can answer special issue number one yes or no. You said you could. Could you listen to the mitigation evidence and make that decision after you've answered all those properly, I think you've always said, yes, I'll wait and hear it. But when they're reading the answers to some of your questions, the fact that you may believe in the death penalty kind of bleeds over into some of those answers. . . . Do your views on the death penalty prevent or substantially impair your ability to follow my instructions and to hear the evidence?
>
> SHIPPEY: No, sir.
>
> COURT: So you can set aside your views on the death penalty, listen to the evidence, and follow the instructions I give you?
>
> SHIPPEY: Yes, sir.

Because Shippey agreed that he could set aside his views on the death penalty and follow the law, the trial judge did not abuse his discretion in denying Appellant's challenge for cause. Point of error number ten is overruled.

### D. Veniremember McDonald

Appellant contends that McDonald should have been excused for cause in light of her pro-

death penalty view, her indication that she would automatically answer "yes" to special issue number one, and her inability to consider mitigating evidence. When asked on the juror questionnaire whether a person could be considered a continuing threat based on what they did one time, McDonald answered "yes," and whether a life sentence would sometimes be the appropriate sentence for a defendant convicted of capital murder, McDonald checked "no." After the State explained the law to her, she agreed that a life sentence could be appropriate in certain fact scenarios, but she said that she would have to wait and listen to both sides.

Defense counsel questioned McDonald further regarding whether she would give an automatic death sentence upon a finding of guilt. The judge intervened, saying that McDonald had repeatedly told everyone that she wanted to hear the whole case before making a decision on punishment.

The following exchange then occurred:

STATE: . . . You understand the punishment range is life without parole or death for capital murder?

MCDONALD: That's correct.

STATE: . . . [C]an you consider both of those options before making a decision in this courtroom?

MCDONALD: Yes, ma'am.

. . .

STATE: . . . [Y]ou understand that there can be no automatic death sentences. Are you okay with that?

MCDONALD: Yes, ma'am.

. . .

STATE: . . . Now, whatever the evidence is, whatever phase of trial it comes out in . . . are you okay with holding on and seeing whatever is played out in here? . . . [C]an you keep an open mind before you make any decision about anything in this case?

MCDONALD: Oh, yes . . . most definitely.

McDonald stated that she would have answered the juror questionnaire differently had she received an explanation of the law prior to answering it. She said that she would consider all of the evidence before deciding guilt or innocence and before answering either of the special issues.

After the law was explained to her, McDonald agreed that she would follow the law and the instructions of the judge. The trial court did not err in overruling the challenge for cause against McDonald. Point of error number eleven is overruled.

### E. Veniremember Montanelli

Appellant argues that Montanelli could not consider such things as the defendant's character and background, and that, if she found someone guilty of capital murder, her answer to the first special issue would be "yes" and her answer to the second would be "no."

The State began voir dire with basic explanations of the law, and Montanelli agreed that she would be able to follow the law as a juror. But upon questioning by defense counsel, Montanelli said that she would not be able to consider mitigating circumstances and would automatically answer "no" to special issue number two based on the hypotheticals he posed. The State then began questioning Montanelli again in an attempt to rehabilitate her and explain the law through the use of its own hypotheticals. The trial judge interjected stating: "[S]he's vacillating. . . . She's telling [defense counsel] what he wants to hear. She's telling [the State] what [they] want to hear."

Once more, the defense revisited the law surrounding mitigating evidence and special issue

number two. Through this clarification, Montanelli agreed that she "would certainly consider the mitigating evidence" and would not automatically answer "no" to special issue number two in order to render a death sentence.

A review of the record indicates that Montanelli was confused by the back and forth of questioning by the State and defense, but by the end of the voir dire, she understood the requirements of the law and agreed that she would be able to set aside her personal views and follow the law. The trial judge did not abuse his discretion in denying Appellant's challenge for cause against veniremember Montanelli. Point of error number twelve is overruled.

### F. Veniremembers Cross and Brock

In points of error numbers thirteen and fourteen, Appellant argues the trial judge erred in denying his challenges for cause against veniremembers Cross and Brock. Because Appellant has failed to show that at least three of his complained-of challenges for cause were erroneously denied, he cannot show harm. Issues number thirteen and fourteen are overruled.

Having found no reversible error, we affirm the judgment of the trial court.

Delivered: April 1, 2020
Publish