

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-19-00197-CR

———————————————————

CHAD ALAN CAPPIELLO, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 213th District Court
Tarrant County, Texas
Trial Court No. 1554954D

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

On appeal from his convictions for two counts of theft—one from elderly persons—and one count of misapplication of fiduciary property—also from elderly persons—Chad Alan Cappiello challenges (1) the sufficiency of the evidence to support the dollar values of the amounts he stole from elderly persons and whether he was acting as a fiduciary and (2) two of the State's jury arguments. We affirm the theft-from-elderly-persons conviction, but we reverse the misapplication-of-fiduciary-property conviction and the second theft conviction and render judgment acquitting Cappiello of those two offenses.

## I. Background

After the State charged Cappiello with two counts of theft and one count of misapplication of fiduciary property, a jury convicted him of all three offenses. The evidence at trial showed that Cappiello held himself out as a contractor under the names Extreme Remodeling, Extreme Exteriors, and Southland Exteriors. Several witnesses testified that they had contracted with Cappiello in Tarrant County for remodeling work and that they had paid him for part of the work in advance, but that he never did the work or, in one case, did only some of the work. The State also presented evidence under Rule 404(b) that Cappiello had engaged in similar behavior with complainants in other counties and that the behavior had resulted in a theft conviction in Hopkins County. Tex. R. Evid. 404(b). The evidence also showed that Cappiello had already been convicted of the Hopkins County offense when he took

the money from the Tarrant County complainants in this case, but he had not yet been sentenced or incarcerated; the State relied on this evidence to show that Cappiello never intended to perform the contracted-for work for the Tarrant County complainants.

According to the jury's assessment, the trial court sentenced Cappiello to forty-seven years' confinement on both the theft-from-elderly-persons and misapplication-of-fiduciary-property counts and twenty years' confinement on the second theft count; the court also imposed a $10,000 fine for each charge in accordance with the jury's verdict.

## II. Sufficiency Challenges

Cappiello does not challenge the sufficiency of the evidence to prove the non-elderly-person theft count or that he stole property generally. Instead, in his first point, he challenges the sufficiency of the evidence to support the dollar amount that he stole from elderly persons.[1]

### A. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex.

---

[1]Cappiello also challenges the sufficiency of the evidence to support the dollar amount of the misapplication-of-fiduciary-property conviction, but we do not address that conviction in our discussion of this point.

Crim. App. 2017). Because the factfinder alone judges the evidence's weight and credibility, Tex. Code Crim. Proc. Ann. art. 38.04, this standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622. Instead of re-evaluating the evidence's weight and credibility and substituting our judgment for the factfinder's, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

To determine whether the State has met its *Jackson* burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is

4

authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The "law as authorized by the indictment" means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

## B. Theft Conviction

### 1. Elements of Theft

To prove theft, the State must show that a person has "unlawfully appropriate[d] property with intent to deprive the owner" of that property. Tex. Penal Code Ann. § 31.03(a). Theft is a third-degree felony "if the value of the property stolen is $30,000 or more but less than $150,000." *Id.* § 31.03(e)(5). When the person whose property was stolen is elderly, the offense degree and punishment range are further increased; thus, theft of property valued at $30,000 or more but less than $150,000 from an elderly person is a second-degree felony. *Id.* § 31.03(f)(3)(A).

When an actor steals from one or more persons "pursuant to one scheme or continuing course of conduct, . . . the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense." *Id.* § 31.09. Here,

5

the State alleged that Cappiello had stolen from four elderly victims pursuant to a continuing course of conduct. Cappiello contends that because he performed some of the contracted-for work for two of those elderly complainants, the Scotts, and because the State did not prove what part of the Scotts' total contract amount had been allocated to the completed work, the State failed to prove that he stole property from an elderly person in an amount over $30,000.

**2. Applicable Facts**

Seventy-nine-year-old Eulalia Treesh hired Cappiello for a complete bathroom remodel and signed a contract to pay him $12,980. Although Cappiello had originally asked Treesh to pay him half of the contract price up front, she declined. Instead, she gave him $1,298, ten percent of the total. She later paid Cappiello forty percent of the contract price—$5,692—after he brought products for her to look at. After Cappiello had done that several times, Treesh settled on colors and "felt [they] were ready to go and he was going to need money to buy product." But Cappiello never started the work or dropped off supplies or materials.

Seventy-year-old John Martindale hired Cappiello for home repairs and paid him $1,500 the day Cappiello made the $15,980 bid. Martindale later gave Cappiello $7,500 to buy materials, but Martindale "never saw him or heard from him again."

Mary Barclay, a former neighbor of Charles and Thelma Scott, testified about the Scotts' dealings with Cappiello because the Scotts had both died by the time of Cappiello's trial. Barclay testified that the Scotts had contracted with Cappiello to

6

remove and replace the carpeting in their home. According to Barclay, the Scotts paid Cappiello either $28,000 or $25,000 "before [they] received any merchandise or anything to do enough for the house." But Barclay did confirm that work was done on the driveway, and she did not know of any problems with it. When Thelma Scott called Cappiello to find out why there had been a delay in the work and why materials had not been delivered, he told her that the materials had already been ordered. However, as with Treesh and Martindale, Cappiello did no work for, and provided no materials to, the Scotts—other than the driveway—and never returned the Scotts' money.

The Scotts' initial contract was admitted into evidence. It provided for a total price of $25,780 and stated the scope of work as follows:

> Tear out existing driveway (excluding approach)[.] Repour new driveway 6" thick, rebar steel. Replace floors throughout home w/ vinyl plank wood look, burnished hickory in color (exclude closets)[.] Install shoe mold throughout. Paint baseboards & door casings throughout (CTS) to select colors. Install wood below dishwasher to close opening (stain to match). Paint hall walls[.] Recase & replace (if needed) 1 post in back of home. Clean & restain or paint garage floor (CTS) to select colors & styles as provided by (ER).
>
> Lifetime-mfg floors

A change order, executed a month later, provided,

> We are changing/adding to our original agreement(s) as follows:
>
> Completed concrete driveway. 4/22/17. Hold color of floors until final approval by (CTS) Ie, review larger sample & or picture from mfg by (ER). Still awaiting (CTS) to finish boxing belongings prior to floors as well. Due to completion of driveway & hold on floors (ER) needs draw in amount of $5,000.00[.] This is considered the invoice for comp[l]etion of driveway. Leaving a balance of $7,890 upon completion.

7

Another change order executed two weeks later stated that the parties were "confirming our original agreement(s) as follows: color of interior floors to be as agreed in original burnished hickory in color. As per larger sample provided."

Bank records showed that the Scotts paid fifty percent of the $25,780 total—$12,890—by check. They also paid an additional $5,000 by check. No bank records confirmed any other payment by the Scotts.

An expert forensic financial analyst who reviewed Extreme Remodeling's bank records[2] testified that from March 16, 2017, through February 2019, $52,620 was deposited in its bank account. She found references on withdrawal slips regarding "concrete-Mendoza" and "concrete-Bobo," for a total of $3,600,[3] which she deducted as being actually related to the Scotts' job—because they "did receive a driveway"—leaving $49,020 net deposits from all homeowners, elderly and non-elderly. In breaking down the total deposits from elderly homeowners, the analyst calculated $9,000 from Martindale, $6,990 from Treesh, and $14,290 from the Scotts ($17,890 minus $3,600) for a total of $30,280. The analyst stated, "That is the total amount of money that is unaccounted for that the [elderly] homeowners have lost."

The analyst agreed that she had not reviewed any documentation that would allow her to determine how much of the Scotts' total contract with Cappiello—

[2]She did not review the construction contracts.

[3]According to the analyst, this amount could have been for labor or materials.

$30,780—was intended to be for the driveway versus the interior work or how much profit the Scotts and Cappiello might have contracted for on the driveway part of the project: "There's no supporting documentation for me to know what the Scotts agreed to." When asked on cross-examination, "If the Scotts felt that the second $5,000 expenditure was to be invoiced at $5,000 towards that job, do you think it would be appropriate to reduce that amount from $30,280 to something lower?" she answered, "No. . . . [b]ecause I'm showing that he paid out $3,600." Although she acknowledged that contractors are generally paid more than material costs and subcontracting costs on construction contracts and that they are entitled to make a profit—and that such a profit is a "legitimate business expense"—here, she could not tell from the account what Cappiello's "normal profit" would be on any other jobs. There was no evidence of any "normal expenses" paid from his account, such as payments to other contractors or materials purchased. Thus, the analyst concluded that the Scotts' contract was not a "normal . . . construction contract." She determined that the only overhead-type expenses paid from the account were regular debits for auto-insurance premiums and for fees charged by a company that provides cold-calling leads. But most of the withdrawals were to cash.[4]

In response to questioning as to whether the correct measurement for how much was stolen from the Scotts depended on what they had expected to pay for a

---

[4]According to the analyst, "[B]ased on my experience, 32 years, most legitimate businesses don't do business in cash. They leave a paper trail showing their rent and their electricity so that the accountants can account for it."

completed driveway, the analyst answered, "The legitimate business expense toward that driveway was $3,600." She had not reviewed any data indicating that Cappiello had expected to make any kind of profit on the driveway. But the analyst testified that in looking at the contract and change order admitted as Cappiello's exhibits, she had noticed that

> nothing was broken out. And normally in contracts, they will break out, we're going to do the carpeting and it's going to run this much, and we're going to do this, and then they'll even break it out between what's going to be the material and the labors. He's got everything -- everything was preprinted and he just wrote it in real quick the first time he met these people. I've never, in all of my experience, seen contracts like that.

The analyst admitted that Cappiello had traveled to the complainants' homes and showed them samples.

On redirect, however, the analyst testified that she believed Cappiello had used and paid for the cold-calling-lead service and automobile insurance solely to further his criminal operation. She averred that from an accountant's perspective, profit on a construction job is not realized until

> the very end. Because when you've got a job, especially when you have multiple contracts out there, normally, a contractor, a general contractor, as he was posing, will have a ledger for each job. And so when you take in the funds and you pay this contractor for that concrete, you're going to record it on that ledger and you're going to keep track of what is going out moneywise for that job. Then, you know, as that – 'cause one contractor may be working on multiple jobs, so you're going to have a ledger on each job.

When asked, "[W]ould it be fair to say that the profit from all of the remodeling activity work on that one address could not be recognized until the entirety of the

project was completed," she answered, "Correct." Although part of the work at the Scotts' home was completed, the entire project for which they had contracted was not.

A district attorney's office investigator who looked into the series of thefts testified that he did not have the expertise to value the driveway job for the Scotts. He said, "Sure," when asked if the driveway was "a significant part of the contract." He agreed that the driveway had been completed but said it "looked like it still needed to be repaired" and "wasn't a very good job." For example, the edges were crumbling and cracked.

The investigator testified that, in his experience, sometimes preliminary work will be done before a theft to gain trust:

> [P]rimarily what I see a lot is they'll take a down payment, a percentage of the payment and they will completely demo maybe a bathroom, let's just say and then they come back to the well, so to speak, and say we've demoed the bathroom, I now need X amount of dollars for this and that's generally what happens. From my experience I don't see real large amounts from different victims. I see shots at different victims of 5,000, 6,000 12,000, 4,000. It's just depending on the victim in a lot of respects on what they're needing done and what they have available for that -- for that suspect.

In other words, according to the investigator, victims might be more willing to give the person more money once they have "some skin in the game"; here, the driveway work prompted the Scotts to give Cappiello an extra $5,000. But the investigator also stated that it "would probably be fair" to say that "as far as [he was] concerned, [$5,000] was not stolen from the Scotts."

11

### 3. Analysis

Cappiello claims that the evidence is insufficient to support the dollar amount of the theft-from-an-elderly-person conviction because it is "undisputed" that the value of the driveway part of the Scotts' contract was $5,000. Although the investigator testified that "to be fair," the $5,000 "was [for] the completion of the driveway," as stated in the Scotts' change order, his testimony is hardly conclusive as Cappiello claims. It is well-established that the factfinder alone judges the evidence's weight and credibility, Tex. Code Crim. Proc. Ann. art. 38.04, and resolves any conflicts in the testimony, *Murray*, 457 S.W.3d at 448–49. The jury had before it the Scotts' original contract and change order, as well as the analyst's testimony that any profit Cappiello might have expected—or that the Scotts expected to pay—would not have been realized until the entire project had been completed. Not only did the initial contract not attribute any particular dollar amount to any particular work, which included the driveway, the change order can be interpreted as merely acknowledging that the driveway was completed so that Cappiello could take more money from the Scotts, which the investigator acknowledged is a common tactic in these types of cases. Although the sentence, "This is considered the invoice for comp[l]etion of driveway," followed the sentence acknowledging a need for a $5,000 draw due to completion of the driveway *and* the hold on floors, the word "[t]his" more likely refers to the entire change order rather than the $5,000, especially in light of the fact that the Scotts had already paid $12,780. Thus, contrary to Cappiello's assertion, there is no

undisputed evidence that Cappiello and the Scotts had contracted for $5,000 to be paid toward the completion of the driveway.

Because the jury was entitled to resolve the conflicting inferences here in favor of the verdict, we hold that sufficient evidence supports the $30,020 total amount of funds stolen from the Scotts, Treesh, and Martindale. We therefore overrule Cappiello's first point.

## C. Misapplication of Fiduciary Property

In his second point, Cappiello challenges the sufficiency of the evidence to prove that he acted as a fiduciary for purposes of his conviction for misapplication of fiduciary property of an elderly person.

A person commits the offense of misapplication of fiduciary property if "he intentionally, knowingly, or recklessly misapplies property he holds as a fiduciary . . . in a manner that involves substantial risk of loss to the owner of the property or to a person for whose benefit the property is held." Tex. Penal Code Ann. § 32.45(b). Under Section 32.45, a fiduciary

> includes . . .
>
> (A) a trustee, guardian, administrator, executor, conservator, and receiver;
>
> (B) an attorney in fact or agent appointed under a durable power of attorney as provided by Subtitle P, Title 2, Estates Code;
>
> (C) any other person acting in a fiduciary capacity, but not a commercial bailee unless the commercial bailee is a party in a motor fuel sales

13

agreement with a distributor or supplier, as those terms are defined by Section 162.001, Tax Code; and

(D) an officer, manager, employee, or agent carrying on fiduciary functions on behalf of a fiduciary.

*Id.* § 32.45(a). Like theft, the offense is a third-degree felony if the misapplied property is valued at $30,000 or more but less than $150,000, and the category of the offense is increased "to the next higher category of offense" if the victim is elderly. *Id.* § 32.45(c)(5), (d). The Texas Court of Criminal Appeals has held that the plain meaning of "fiduciary capacity" in subsection (C) "encompasses only special relationships of confidence or trust in which one party is obligated to act primarily for the benefit of the other." *Berry v. State*, 424 S.W.3d 579, 580 (Tex. Crim. App. 2014).

In *Berry*, the court relied on its plain-meaning construction of "fiduciary capacity" to hold that a man who took orders and money for window blinds but failed to deliver them was not acting in a fiduciary capacity and therefore could not be convicted under Section 32.45. *Id.* at 582–86. Although not expressly adopting the civil-law definition of fiduciary, for purposes of construing "fiduciary capacity" as used in Section 32.45(a)(1)(C), the court noted that its holdings in Section 32.45 cases "are consistent with an understanding of the term 'fiduciary' as encompassing special trust- or confidence-based relationships," and that imposing a fiduciary relationship in ordinary, arms-length business dealings—such as a contract for the sale of goods or services—"would run contrary to the principle that a fiduciary is obligated to act for the primary benefit of the other party." *Id.* at 584. The expectation that the person will

14

place the other party's interests above his own must be justifiable for a person to be acting in a fiduciary capacity. *Id.* at 585. Thus, merely because a person's customers subjectively trust him to do what he says he would do with their money does not make him a fiduciary. *Id.* at 586.

The State argues that the evidence in this case goes beyond the facts in *Berry* because Cappiello described the down payments from the victims as earnest money—the definition of which presumes that he will hold the funds solely for their benefit—and because his contract included a nondisclosure agreement apparently intended to discourage litigation and reporting of his conduct.[5] But even though the jury in this case could have reasonably concluded that Cappiello posed as a contractor merely to swindle people into giving him money he never intended to use for materials or labor to their benefit, the tenor of each of the transactions from the perspective of the victims was a one-time contract for services. Thus, this case is more like *Berry* than distinguishable from it. *See also Olle v. State*, No. 13-14-00207-CR, 2015 WL 5626192, at *1, *4–6 (Tex. App.—Corpus Christi–Edinburg Sept. 17, 2015, pet. ref'd) (mem. op., not designated for publication) (holding that wedding coordinator who took payments and whom clients trusted to pay vendors with advance payments was not

---

[5]The nondisclosure agreement in Cappiello's contract "essentially says they cannot disclose to anyone, anyone except their bankers, their contract or their relationship with . . . Extreme Remodeling," which the investigator opined meant the complainants would have been in breach by contacting the police. With the Hopkins County victim, Cappiello "sent a letter in response [t]o a police report being filed in Hopkins County threatening him with legal action for reporting the theft to the police."

acting as a fiduciary as defined in *Berry*). *But cf. Warr v. State*, No. 14-18-00058-CR, 2020 WL 428916, at \*1, \*5 (Tex. App.—Houston [14th Dist.] Jan. 28, 2020, pet. ref'd) (mem. op., not designated for publication) (concluding that stockbroker who ran program that pooled clients' funds to invest in income-producing real property or pooled real-estate notes, and guaranteed monthly payments in return of 8% of the interest earned, was acting as a fiduciary under Section 32.45); *Jones v. State*, No. 09-18-00071-CR, 2019 WL 3308958, at \*3–4 (Tex. App.—Beaumont July 24, 2019, pet. ref'd) (mem. op., not designated for publication) (holding that evidence supported jury's finding that corporate officer acted as a fiduciary to corporation when he solicited funds from investors for green energy plant but instead withdrew funds from corporation's account for his personal use).

Even though, here, the victims trusted Cappiello to do what they had contracted with him to do, there is no evidence that such trust went beyond expecting him to abide by the terms of the contract. Thus, insufficient evidence supports the type of justifiable reliance that would allow a conviction under Section 32.45. *See Berry*, 424 S.W.3d at 585–86. We therefore sustain Cappiello's second point.

### III. Double Jeopardy

Upon review of the record, we became concerned that Cappiello's second theft conviction violates the double-jeopardy prohibition against multiple punishments for the same offense; therefore, we asked the parties to file supplemental briefing on the

16

issue. In its supplemental briefing, the State concedes that Cappiello's second theft conviction violates the Double Jeopardy Clause. We agree.[6]

## A. Applicable Law and Standard of Review

The Fifth Amendment protects against multiple punishments for the same offense. *Bien v. State*, 550 S.W.3d 180, 184 (Tex. Crim. App. 2018). To determine whether a defendant has been assessed multiple punishments for the same offense, we start with the "same elements" test set forth in *Blockburger*. *Id.* (referring to *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932)). Under that test, two offenses are not the same if "each provision requires proof of a fact which the other does not." *Id.* (quoting *Blockburger*, 284 U.S. at 304, 52 S. Ct. at 182).

But in Texas, the analysis does not end there. Using the cognate-pleadings approach, we also look to the pleadings to flesh out the *Blockburger* test. *Id.* (citing *Bigon v. State*, 252 S.W.3d 360, 370 (Tex. Crim. App. 2008)). Under the cognate-pleadings approach, even if the offenses have differing elements under *Blockburger*, they may still be the same for double-jeopardy purposes if the indictment alleges the same "facts required." *Bigon*, 252 S.W.3d at 370.

After applying the cognate-pleadings approach, if the two offenses have the same elements, then a judicial presumption arises that the offenses are the same for

---

[6]A double-jeopardy claim may be raised for the first time on appeal "when the undisputed facts show the double jeopardy violation is clearly apparent on the face of the record and when enforcement of [the] usual rules of procedural default serves no legitimate state interests." *Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex. Crim. App. 2000).

17

double-jeopardy purposes, and the defendant may not be convicted of both. *Bien*, 550 S.W.3d at 184. But that presumption can be rebutted if the legislature clearly expressed an intent to create two separate offenses. *Id.*

Conversely, if the two offenses, as pleaded, have different elements, the judicial presumption is that the offenses are different for double-jeopardy purposes, and multiple punishments may be imposed. *Id.* at 184–85. This presumption too can be rebutted by a showing, through various factors, that the legislature clearly intended only one punishment. *Id.* at 185.

## B. Indictment Allegations

For Count One, the State alleged that Cappiello had, "pursuant to one scheme and continuing course of conduct which began on the 15th day of March, 2017 and continued on or about the 18th day of May, 2017," stolen $30,000 or more but less than $150,000 from the Scotts ($17,890), Treesh ($6,990), and Martindale ($9,000). It also alleged that all four were elderly persons. For Count Three, the State alleged that Cappiello had, "pursuant to one scheme and continuing course of conduct which began on the 1st day of January, 2012 and continued on or about the 18th day of May, 2017," stolen $30,000 or more but less than $150,000 from the same complainants and three others: Kathy Smith ($14,740), Cynthia Tumlinson ($5,000), and Lennard Johnson ($4,990). Without the addition of the thefts from Treesh, Martindale, and the Scotts, the State would have been able to prove only state-jail-felony theft on Count

Three—theft of $2,500 or more but less than $30,000. Tex. Penal Code Ann. § 31.03(e)(4)(A).

**C. Analysis**

"[T]heft has two gravamina: the property and ownership." *Kent v. State*, 483 S.W.3d 557, 561 (Tex. Crim. App. 2016); *Johnson v. State*, 364 S.W.3d 292, 297 (Tex. Crim. App. 2012). But for aggregated theft under a scheme or continuing course of conduct, the text of Section 31.09 shows a legislative intent to treat the overall scheme or continuing course of conduct as the culpable criminal behavior—not each individual underlying theft. *Kent*, 483 S.W.3d at 561 (citing Tex. Penal Code Ann. § 31.09). Thus, here, Counts One and Three charged the same offense: a continuing course of theft from multiple persons over time, totaling $30,000 or more but less than $150,000. *See id.* ("Appellant, although accused of multiple misappropriations, was charged with a single criminal offense."). Count One simply added the additional elderly-persons allegation to elevate the punishment level. Accordingly, we conclude that, under the applicable standard of review, the conviction for Count Three violates double jeopardy and must be reversed. *See, e.g.*, *Ex parte Castillo*, 469 S.W.3d 165, 168 (Tex. Crim. App. 2015) ("Under [the *Blockburger*] test, lesser-included offenses are legally the same as a greater offense, and are wholly subsumed by the elements of the greater offense, unless the potential lesser-included offense requires proof of a fact not required to establish the greater offense."); *Ex parte Cavazos*, 203 S.W.3d 333, 338 (Tex. Crim. App. 2006).

## IV. Jury Arguments

Cappiello complains in his third and fourth points about two of the State's jury arguments at guilt–innocence, which we address to the extent that they challenge the theft convictions.

## A. Applicable Law

Permissible jury argument falls within one of the following four general areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to opposing counsel's argument, or (4) plea for law enforcement. *Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011); *Felder v. State*, 848 S.W.2d 85, 94–95 (Tex. Crim. App. 1992).

## B. Hopkins County Offense

Cappiello complains in his third point about one of the prosecutor's references to the Hopkins County extraneous offense. In response to the argument that the charged offenses should be considered civil breach-of-contract matters instead of criminal matters, the prosecutor argued that Cappiello was hiding behind his construction contract as a "get out of jail free" card and that Cappiello had used the contract to threaten his victims into submission, as he had also done in the Hopkins County extraneous offense. The prosecutor then rhetorically asked that if this case involved a mere "civil issue . . . , how did he get convicted in a criminal court in

Hopkins County?" Cappiello's counsel objected, "That's pattern argument way beyond 404B and intent," but the trial judge overruled the objection.[7]

According to Cappiello, this argument improperly invited the jury to consider his guilt of extraneous offenses in determining his guilt of the charged offenses in this case rather than for the sole purpose of proving pattern or intent under Rule 404(b). Even assuming Cappiello is correct,[8] we conclude that he was not harmed by the argument. *See* Tex. R. App. P. 44.2(b); *Martinez v. State*, 17 S.W.3d 677, 692–93 (Tex. Crim. App. 2000) (setting forth harm-assessment standard for improper jury argument, which requires a balancing of three factors: (1) severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of conviction absent the misconduct).

The record contains ample evidence—apart from the Hopkins County conviction—supporting the jury's determination that Cappiello took the victims' money never intending to do any of the contracted work, including evidence that he did not use his real name in some of the contracts, that his contracts contained unusual provisions that appeared to be intended to discourage litigation and reporting

---

[7]The trial judge originally stated, "The jury will recall testimony." But Cappiello's counsel then asked for a ruling, and the judge stated, "Overruled." Based on the preservation argument in the State's brief, the State appears to have overlooked this part of the record.

[8]The prosecutor later argued, without objection, that in the Hopkins County case and in two cases from other counties, Cappiello also contracted with and took money from victims without doing any work.

21

to law enforcement, and that he promised a comparatively large scope of work in an unusually short time frame.

In his closing argument, Cappiello's counsel acknowledged the propriety of the Hopkins County conviction but argued as a defense to the State's use of that conviction under Rule 404(b) that Cappiello had expected he could get an appeal bond and therefore continue the work he had begun on the Scotts' driveway. In response, the prosecutor—comparing the criminal conviction in Hopkins County to this case—emphasized the intent similarity: "[I]f that's the case, why didn't he do the work in Hopkins County?"; thus, the prosecutor's conduct in making the civil–criminal matter comparison was not severe when viewed as referencing the proper purpose of the admission of the evidence for Rule 404(b) purposes.[9]

Finally, and importantly, the jury charge included the following express limiting instruction:

> You are instructed that if there is any testimony before you in this case regarding the defendant['s] having committed an offense other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offense, if any were committed, and even then you may only consider the same in determining the motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose.

___

[9]But even if the prosecutor's argument is construed to stray beyond 404(b) purposes, instead referencing Cappiello's status as a criminal generally, our conclusion would not change based on our review of the comment in the context of the entire record and the other jury-argument factors.

Thus, we conclude that, even assuming the complained-of argument was improper, Cappiello was not harmed by the trial court's error in overruling his objection to that argument. *See* Tex. R. App. P. 44.2(b); *Martinez*, 17 S.W.3d at 692–93. We overrule his third point.

## C. Submission of Lesser-Included Offense Instruction

In his fourth point, Cappiello complains that the trial court allowed the State to engage in improper "vouching." When discussing the trial court's inclusion of a lesser-included offense in the charge for the theft-from-elderly-persons count (aggregated theft between $2,500 and $30,000), the prosecutor told the jury,

> When you get the charge, you're going [to] look at it. All of [a] sudden, there's new language in there about a theft from 2500 to 30,000. That's below what we've alleged in our indictment, but it's in here now and you guys get to consider it. They want you to consider it because they want you to think $5,000 drops it down. That's a lower offense now. And if he's earned that 5,000, you get to consider that lower offense. I didn't put that offense in my indictment.

The trial court overruled Cappiello's "vouching" objection.

According to Cappiello, "It should never be proper jury argument that a theory of the case raised by the evidence [and therefore properly submitted by the judge] is unworthy of consideration because it was not in the prosecutor's indictment." Assuming that Cappiello's objection preserved his appellate complaint,[10] we conclude

---

[10]A vouching objection is generally understood as challenging the improper vouching for the credibility of a witness. *See, e.g.*, *Thomas v. State*, 706 S.W.2d 769, 772 (Tex. App.—Houston [14th Dist.] 1986, pet. ref'd). But, here, it could be understood as meaning the prosecutor's vouching for the accuracy of the indictment.

that the argument was not improper. First, the statements are true: the indictment did not include the lesser offense, and the jury could consider the lesser if it believed Cappiello had earned the full $5,000. *See Jackson v. State*, 822 S.W.2d 18, 29 (Tex. Crim. App. 1990). Second, even if the prosecutor was implying that the greater offense charged in the indictment—and in the jury charge—was a more appropriate conviction based on the evidence, that implication is an argument from the evidence and therefore within the permissible areas of jury argument. *See Freeman*, 340 S.W.3d at 727. Accordingly, we overrule Cappiello's fourth point.

## V. Conclusion

Having sustained Cappiello's second point but having overruled his other points, we affirm the trial court's judgment on the theft-from-elderly-persons count (Count One), but we reverse the trial court's judgment on the misapplication-of-fiduciary-property count (Count Two) and render a judgment of acquittal on that count. Having determined that Cappiello's second theft conviction violates the Double Jeopardy Clause by imposing multiple punishments for the same offense, we reverse the trial court's judgment as to that count (Count Three), and we render a judgment of acquittal on that count.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)
Delivered: May 5, 2022

24